**DIVISION OF FAMILY SERVICE (DFS), Petitioner,**

v.

**N.X. and G.X., Respondents.**

**In the Interest of: G.Jr. X. (d.o.b. 11/11/97).**

**No. 01–08–08TN.**

Family Court of Delaware, New Castle County.

Submitted: Jan. 25, 2002.
Decided: April 23, 2002.

---

Michael Ripple, Esq., Department of Justice, Wilmington, for Petitioner.

John James Conly, Esq., Wilmington, for Respondent Mother.

Gary Linarducci, Esq., New Castle, for Respondent Father.

Kelly Sasso, Esq., Valocchi & Sasso, P.A., Wilmington, for CASA, Catherine Bentz.

## DECISION REGARDING PETITION TO TERMINATE PARENTAL RIGHTS

COONIN, J.

This matter is before the Court on the Petition of the Department of Services for Children, Youth and Their Families, Division of Family Services (hereinafter "DFS") against N.X. (hereinafter "Mother") and G.X., (hereinafter "Father") seeking to terminate parental rights in their son, G.Jr. X., d.o.b. 11/11/97 (hereinafter G.Jr.) for the purpose of freeing G.Jr. for adoption. The Petition seeks termination of parental rights of both parents on the grounds of failure to plan in accordance with 13 Del.C. § 1103(a)(5). The Petition was filed on August 17, 2001. Trial was held on January 16 and 17, 2002, with post-trial memorandum being submitted to the Court on January 25, 2002. This is the Court's Decision on the Petition for Termination of Parental Rights.

### FINDINGS OF FACT

G.Jr. was born on November 11, 1997. At the time of G.Jr.'s birth, Mother and

Father, although unmarried, had been living together as a couple for eight years. The initial referral received by DFS occurred immediately after G.Jr.'s birth when it was reported that Mother had tested positive for cocaine use both at G.Jr.'s birth as well as during prenatal clinic visits. Mother was immediately referred to the Public Health Nurse program and to Birthright of Delaware where she entered an out patient drug treatment program. DFS closed its case file in December of 1997 at which time Mother was receiving out patient drug counseling services, Father was maintaining steady employment and G.Jr. was doing well residing with his parents.

A second referral was reported to DFS on February 6, 1999, when a domestic dispute occurred between Mother and Father in the presence of G.Jr. Because Mother had reported to police that Father had physically abused her in front of G.Jr. a Safety Plan was entered into prohibiting any contact between Father and G.Jr. Father was arrested and charged with a variety of offenses including Offensive Touching and Endangering the Welfare of a Child. On August 3, 1999 Father pled Nolo Contendre to Terroristic Threatening and all of the remaining charges were nolle prossed. Father was placed on Level III probation, and ordered to take anger control counseling, family counseling and cooperate with Children's Choice. On March 6, 2000, Father who had violated his probation, was sentenced to six months of Level IV work release followed by six months of Level III probation, ordered to complete his anger management program and assigned to SODAT for treatment of his drug issues. Father was violated on Probation March 2001 and was sentenced on April 2, 2001 to Level IV Crest Program for a period of 12 months with Level III probation to follow his release from Crest.

On February 18, 2000, a third referral was received by DFS in which it was reported that G.Jr. had not been picked up from his daycare and that neither Mother nor Father could be located. Emergency custody of G.Jr. was awarded to DFS when it was discovered that Mother had that day been incarcerated at WCI for cashing bad checks and that Father was at Gander Hill on his violation of probation. A Probable Cause Hearing was held on February 28, 2000, without either Mother or Father in attendance, at which time custody of G.Jr. was continued with DFS. On March 15, 2000, an Adjudicatory Hearing was held in which both parents appeared *pro se*, where it was stipulated by the parties that due to both parents' incarcerations, it would be in the best interest of G.Jr. to remain in DFS custody. While Father was incarcerated, DFS did not enter into a formal Case Plan with Father at that time, although Dennis Moore, the DFS Investigation Unit Worker met with Father at Gander Hill sometime in March of 2000 to discuss with Father what he would need to do in order to have G.Jr. placed back in his care.

Andrea Snitcher, DFS Treatment Worker, received the case in March of 2000 while both parents were incarcerated. During this period of incarceration, visitation was provided with Mother at WCI every week and with Father at Gander Hill bi-weekly. Both parents expressed to Ms. Snitcher their desire to receive their son back into their care as soon as they were released.

Prior to Mother's February 2000 incarceration, Mother was still receiving counseling services at Brandywine Counseling (BCI) at the direction of DFS. Mother was released from incarceration in April of 2000 and placed on home confinement until October of 2000. At about the same time, April 10, 2000, BCI discharged Mother,

noting in its discharge summary that Mother's prognosis was poor. According to the discharge summary, Mother had failed during the preceding year to accept her addiction. Noting Mother would not be readmitted to BCI unless she completed an in-patient drug treatment program. Despite BCI's poor prognosis of Mother and the proviso that Mother not be readmitted to BCI for out-patient counseling until after she completed an in-patient residential treatment program, in May of 2000, DFS nonetheless referred Mother to out-patient treatment services, this time at the North East Treatment Center (NET). Mother's treatment plan summary at NET noted that Mother lacked the necessary coping skills to deal with her addiction issues, an opinion similar to the one previously rendered by BCI, and that Mother was in need of developing a sober support network of peers. Two months later NET discharged Mother on June 25, 2000, noting that Mother had not completed all of her treatment areas and that she needed to focus on issues that were causing her to relapse.

Father was released from Gander Hill and transferred to the Plummer Center in May of 2000, where he regularly maintained contact with his son. While in Plummer Center, Father had some 20 visits with G.Jr. between the period of May 2000 to October 2000, with the interaction between Father and G.Jr. during these visitations being reported as appropriate.

In early June of 2000, the Foster Care Review Board met and recommended that the goal for G.Jr. would continue to be reunification with his parents. By this time, Mother and Father had earned the privilege of having visits with G.Jr. in their home.

On July 18, 2000, Mother was referred to SODAT with an intake history reported as extensive for drug and alcohol abuse; of relapsing despite prior treatment; of lacking a recovery oriented support system and the coping skills to deal with life stressors without abusing drugs. Nevertheless, the plan for addressing these problems was to again offer Mother out-patient treatment. Mother's course of out-patient treatment at SODAT was, as before, at BCI and NET, unsuccessful, Mother's conduct being characterized as "uncooperative" a euphemism for failing to attain her treatment goals. Specifically, during her entire treatment program at SODAT, Mother attended but 9 out of 24 scheduled psychotherapy sessions and but one counseling session. Based on Mother's poor attendance in therapy and her failure to demonstrate progress in her treatment, Mother was eventually discharged from SODAT in October of 2000, a result similar to that at BCI four months earlier when BCI recommended in-patient treatment.

In the meantime, overnight visitation with G.Jr. in Mother and Father's home had resumed in August of 2000. These visits continued for 7 weeks until early October of 2000. The visits occurred without incident or reports of any inappropriate behavior by Mother or Father in the presence of G.Jr.

In early October, Mother contacted the police alleging that Father was abusing drugs in their home. By mid October both Mother and Father were found to have violated the terms of their probation, specifically with regard to continued substance abuse. Mother would later be transferred to the probation center at Georgetown to complete her violation sentence for the next several months. Visitation between Mother and G.Jr. continued during Mother's incarceration.

Father entered into a Case Plan with DFS on December 6, 2000, at which time Father agreed to participate in out-patient treatment at Brandywine Counseling

(BCI); attend anger management classes at Catholic Charities; maintain sobriety; submit to frequent urine screens; obtain employment and maintain consistent visitation with Glen[1]. Father was maintaining employment; however, an eye injury effected the amount of hours he could work. By late December of 2000, Father was again violated and incarcerated for not following through with his treatment, evidenced by two dirty urine screens and his failure to report to his probation officer. Father had advised his probation officer that he intended to attend the Recovery Center of Delaware, but, to her knowledge, Father never reported there.

A Judicial Review was held before Commissioner Stewart on January 10, 2001, at which time the Court approved the continuing goal of reunification. Intensive Reunification Services were begun immediately upon Mother's release from prison. Mother entered into a new Case Plan with DFS on January 23, 2001. The DFS conditions in the new Case Plan included Mother's participation in out-patient therapy at BCI and her maintenance of sobriety; obtaining stable employment and housing; and maintaining regular contact with her probation officer.

Although Father had requested in-patient treatment at Recovery Center of Delaware (RCD), in February of 2001 Father was referred to NET for out-patient treatment for his addiction. Father's treatment plan emphasized Father's potential for relapse and therefore Father was enrolled in frequent individual and group counseling for narcotics and alcohol on a weekly basis. Father was also instructed to follow up with his DFS worker, as well as to schedule an appointment with a mental health care practitioner, Dr. Lifrak, to deal with emotional issues relating back to incidents in Father's childhood. Because Father was re-incarcerated on a VOP by March 2001, he never met with Dr. Lifrak to address his mental health concerns.

On March 15, 2001, the Permanency Committee of DFS met and decided to continue reunification as the goal. Mother was released from prison the same day and placed on Level III probation until May of 2001. Like Father, Mother was directed to out patient drug treatment services and an intensive reunification worker was assigned to work with Mother and Father to increase visitation with G.Jr. Susan Schrepple, the DFS Intensive Reunification Worker assigned, testified that as the ASFA deadline was approaching, it was DFS's plan to move G.Jr. back into his parents' home as soon as possible, thus justifying the assignment of intensive services for the first time. Ms. Schrepple testified that she explained to Mother the significance of the ASFA deadline and the importance of her complying with her current Case Plan. Ten days later, on March 26, 2001, Father was incarcerated, again for being violated on substance abuse issues, and sentenced to CREST, while Mother admitted to having a drug relapse on the following day. Mother's continued drug dependence was obvious to DFS for some time. On days when Ms. Schrepple had scheduled visitation, Mother was often asleep when she arrived, unidentifiable people were present in Mother's home during visitation, Mother would appear inappropriately dressed, and was making suicidal threats if her son was not returned to her. Because Mother was believed to be suffering from severe depression, Ms. Schrepple directed her to seek treatment from her primary care physician in order

---

1. This appears to be the only Case Plan entered into between Father and DFS as no others were offered into evidence at trial.

to obtain a referral. Despite what DFS characterized as "intensive reunification efforts", DFS offered no specific services to treat Mother's mental health needs.

By April 2001, Ms. Schrepple stopped Mother's in home visitation with G.Jr. On April 26th, Mother was once again sent to SODAT for out-patient drug and alcohol treatment. After attending several sessions, Mother requested in-patient treatment, which was denied when medicaid refused to pay for the service. No evidence was presented as to the reasons for the denial, nor what efforts, if any, DFS made to secure alternate residential treatment for Mother. The following month the Permanency Committee of DFS met and determined that too much time had elapsed while both parents continued to struggle with their addiction and G.Jr. needed a stability that his parents could not provide him due to their repeated incarcerations for substance violations. DFS officially changed its goal to TPR/Adoption.

In June of 2001, Mother reported to the Plummer Center to visit her probation officer after drinking a beer. Mother's probation was violated and she was placed back at WCI. Mother had according to both Mother and her probation officer, consumed the alcohol intentionally, for the expressed purpose of forcing her probation officer to violate her in order that Mother could receive the in-patient services she so desperately needed. On August 6, 2001, three months after the Permanency Committee changed DFS's goal to TPR/Adoption William Greer, a DFS Permanency Worker notified Mother at WCI that DFS now planned to seek Termination of Parental Rights and that his job was to find an appropriate adoptive placement for G.Jr. Mother's visitation schedule was now reduced to one visit per month. DFS filed its TPR Petition on August 17, 2001.

Although Mother and Father never married they have been partners for the past eight years. Both parties testified at trial of the love they have for their son and their desire to have him back in their lives. Although both parties have struggled with their own personal drug addictions for years, there was no evidence presented that they were unfit parents while G.Jr. was in their care. Although there were reports of domestic violence in February of 1999, one of which allegedly occurred in the presence of G.Jr. Mother testified that these incidents were fabricated by her to get back at Father for attempting to prevent her from her continued drug use. While Father pled nolo contendre to Terroristic Threatening against Mother, the Endangering the Welfare of a Child charges were nolle prossed and no restrictions on Father's contact with G.Jr. were ever imposed in any criminal sentencing.

Prior to Father's incarceration he maintained a steady employment history while G.Jr. was in his care. Following Father's release from prison, he relocated to Dover where he has an apartment and has been working as a cook since September of 2001. Father's relocation to Dover was, according to him, in order to escape from his old environment in Wilmington which he felt was detrimental to him and influenced his continued drug use. Father has family in Dover which he believes provides him with a support system that he desperately needs. He has recently located an appropriate day care facility where G.Jr. could attend if custody were at some point returned to him. According to Father, he contacted William Greer of DFS approximately three weeks before trial requesting visitation with G.Jr. but was refused visitation by Mr. Greer because Father has not seen G.Jr. since July of last year. Father indicated that while he has not been provided with regular visitation of G.Jr. by

DFS for an extended period, Father was aware of Mother's regular visitation and has been kept apprised of G.Jr.'s well being by Mother in her regular correspondence to him.

Mother testified as to her deep concerns about the possibility of her parental rights being terminated. She understood that she was missing out on some of the important developmental years; however, she expressed hope that G.Jr.'s Father could receive custody until she is released from prison. Mother's interaction with G.Jr. during visitation has been described as loving and gentle by both the CASA and the DFS workers who testified.

Mother recounted all of her efforts over the years to remain drug free, but she noted emphatically that she has always believed she needed in-patient treatment, a conclusion first espoused by BCI in Mother's discharge summary of April 10, 2000, and the motivation for Mother's intentional VOP in order to receive in-patient services she so desperately needed to over come her addictions. Since being re-incarcerated in June of 2001, Mother's accomplishments are significant. She has participated in and successfully completed programs by the Delaware Association of Children of Alcoholics, a Bible course, an HIV/AIDS seminar, and a Food Safety seminar. Mother is in the process of completing her drug and alcohol treatment program, and participates in a mental health educational group, a self-esteem group, a creative therapy group, and an anger management course, as well as taking classes in creative writing and exercise. While the Court recognizes that in the structure of prison environment it may be easy for Mother to become motivated to participate in these programs, nevertheless, Mother's determination should not be ignored.

G.Jr. is a happy, healthy, energetic 4 year-old boy who is developmentally on target to enter kindergarten next fall. Currently G.Jr. is attending the Head Start Program. G.Jr. attends weekly counseling sessions with Lisa Savage at the multi-cultural center for anxiety and separation issues. G.Jr. has been in the foster home of the Hicks family since December of 2001. Although originally the Hicks' desired to adopt G.Jr. they changed their decision shortly before the hearing while DFS believes that G.Jr. is readily adoptable, at the present time, no specific adoptive resource family has been identified.

## CONTENTIONS OF THE PARTIES

DFS seeks termination of parents' parental rights pursuant to 13 *Del.C.* § 1103(a)(5), that the parents have failed to adequately plan for this child, for a period of some two years. Counsel for DFS points out in his closing argument that on two separate occasions the Permanency Committee approved a plan of reunification, and that, despite what he contends were the Divisions best efforts, drug use and incarceration continued by both parents. Moreover DFS points out that while there is little doubt that both parents love this child, the parents' positive efforts towards attaining the goal of reunification come too little too late. DFS argues that only in the structured environment of incarceration has Mother shown the willingness to take the necessary steps toward becoming an appropriate parent. DFS asserts that Father's removal from the old drug plagued neighborhood to Dover where he has a family support network and obtaining employment since release from incarceration should not be considered a predictor of the future in light of the history of drug use and instability. DFS and CASA urge the Court to find that the best interest of this child require the stability that would be provided by

immediately freeing him for adoption and not repeating the past two years failed process.

Mother argues that the Petitioner has failed to meet its burden and that too little time or resources were ever provided to allow these parents to succeed. Specifically she asserts that the evidence is not clear and convincing that DFS used all reasonable efforts to provide these parents with a plan that could result in reunification and that only when it was faced with the approaching federally mandated time limit for reunification or TPR/Adoption did DFS take this situation of these parents seriously by assigning an Intensive Reunification Specialist. Moreover Mother argues that contrary to DFS's position, domestic violence was never an issue in this household, that Father's anger towards Mother was motivated by a desire to protect the child in light of Mother's out of control drug use and it is not in this child's best interest that his relationship with his parents be severed. Mother's counsel points out, that while G.Jr. has adjusted well in foster care, the child is considered by everyone to be a well adjusted happy boy who interacts well with everyone. Any readjustment to returning to his parents would be no more difficult than readjusting to a new family.

Father's counsel asserts that Mother and Father were denied due process by failing to be provided with legal counsel at the March 15, 2000, Adjudicatory Hearing in which G.Jr. was found to be a dependent child as defined by 10 Del.C. § 901(8), as well as the failure of the State to provide the parents with written notification at some point thereafter that their parental rights would be effected by their failure to comply with the DFS treatment plan. Father asserts that the treatment plans were not reasonably calculated to permit Respondents to attain the goal of reunification and that while Mother tried to follow the plan, she was destined to fail from the beginning because she needed residential treatment in order to succeed, a condition that should have been known to DFS. Father further argues that the State has not met its burden of presenting by clear and convincing evidence that it is in this child's best interest that his parents' parental rights be terminated. Father specifically points to the care and attention that G.Jr. apparently received when he was in his parent's home, and the absence of a current proposed adoptive resource family. Father cites the fact that he has established a home, employment and plans for child care with the desire to be reunited with his son.

The CASA argues that the consideration by the Court of the best interest of this child in light of the factors set forth in 13 Del.C. § 722 weigh on the side of TPR/Adoption as the best method for providing stability in this child's life. CASA points out that despite recent positive efforts by Respondent parents, they are in effect asking for a "second" chance having failed their first. Specifically CASA argues that in reviewing the Case Plans for these parents, none of the requirements set forth in the Plans have been totally met, (1) Father's recent interest in G.Jr. is somewhat new found, as evidenced by his failure to make any effort to re-establish contact with G.Jr. for a five month period following his release from prison, (2) G.Jr. remaining in his current foster home where he is doing well while awaiting the identification of an adoptive family is a more stable solution for this child then gambling on his future if returned to his parents, and (3) that while Mother's love for G.Jr. is obvious, she is currently not available as a placement resource.

### ANALYSIS

In Delaware, in order to terminate parental rights, the Court must perform a

two step analysis. First there must be proof of an enumerated statutory basis for the termination. Second there must be a determination that severing the parental right is in the best interest of the child. *Division of Family Services v. Hutton,* Del.Supr., 765 A.2d 1267, 1271 (2001); *Shepherd v. Clemens,* Del.Supr., 752 A.2d 533, 536–537 (2000) (*en banc*). Additionally, the Court must be satisfied that there has been meaningful compliance with the Child Welfare Act of 1980 § 608, 620–629 and 670–676 and the corresponding Delaware Statute, 29 *Del.C.* § 9003(a)(2) and (3). These laws require that the Court review whether the State developed a meaningful Case Plan to guide a parent through a meaningful process that would help the parent be reunited with the child, and also to be sure that the State has made reasonable efforts to reunify the family or prevent placement. 42 U.S.C.A. § 675(1) and § 671(a)(15).

While the Child Welfare Act of 1980 focuses on the protection of parents' rights, the Adoption and Safe Families Act of 1997 (ASFA) emphasizes the importance of promoting the safety of the child and the child's need for permanency by placing limits on the time in which parents are given to rehabilitate themselves and assume their parental responsibilities, provided that the State has met its duties to provide a meaningful process and reasonable efforts to reunify the family. *In the Interest of: K.L.T.,* Del.Fam. Ct., No. 99–12–05 TPR, Henrickson, J. Jan. 22, 2001, 2001 WL 493113.

■ Before turning to the analysis of the facts in this case to the statutory requirements for termination of parental rights, the Court will first address the issues raised by Father regarding due process. As previously noted, Father claims violation of due process in two distinct respects:

(1) Failure to be notified that he had a right to an attorney at the March 15, 2000, Adjudicatory Hearing, and

(2) Failure to be notified on March 15, 2000, that his parental rights could be terminated if he agreed to allow DFS to retain temporary custody of his son for 12 months.[2]

With regard to the claim that Due Process was violated by not being advised of a right to an attorney at the March 15, 2000 hearing, the Court notes that Father does not argue that he requested but was denied counsel, but rather that the violation of due process arises by virtue of the failure of the Court to advise him in advance of his right to court appointed counsel. The Court notes that the Commissioner's Order from the hearing of March 15, 2000[3] does not reflect that either Mother or Father requested counsel but does make a finding that Mother was incarcerated at WCI and Father incarcerated at Gander Hill at the time of the hearing. The Order further states that the parties agreed that the child was a dependent child as defined by 10 *Del.C.* § 901(8), that it was in the child's best interest to be in the care and legal custody of the Division of Family Services and that the State was making reasonable efforts to reunification at that time.

In the recent case of *Brown v. Division of Family Services,* Del.Supr., 803 A.2d 948 (2002), the Delaware Supreme Court addressed the issue of whether an indigent parent was denied Due Process under ei-

---

**2.** These two arguments were raised for the first time by Father in his attorney's post trial memorandum to the Court on January 25, 2002.

**3.** The two page Decision of Commissioner Stewart from the hearing of March 15, 2000 was admitted into evidence as Petitioner's Exhibit 2.

ther the United States or Delaware Constitutions by the State's failure to advise the parent in advance of a Termination of Parental Rights hearing of their right to request the appointment of legal counsel if they believe they so qualified. As Delaware does not have a statute requiring the appointment of counsel to represent indigent parents in TPR proceedings, that determination was required to be made on a case by case basis in accordance with the holding in *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In *Brown*, the Delaware Supreme Court specifically declined to address the issue of whether the Delaware Constitution mandates the appointment of counsel for all indigent persons in termination proceedings noting that the issue may only be decided "... in a future case if, following a timely request for legal representation, the Family Court ever declines to appoint counsel for an indigent parent in a termination proceeding". *Brown*, Supra. at 956.

There is no evidence presented before this Court that Father requested and the Court denied the appointment of counsel in the March 15, 2000 hearing. Nor was the March 15, 2000 Decision of the Commissioner appealed. The Court notes that at the pre-trial conference held by this Judge on Friday, September 14, 2001, a conference in which Father participated by telephone, the Court specifically appointed counsel to represent Father following the Court's inquiry as to his financial resources. Even assuming *arguendo* that it was an error to not appoint counsel, any harm was cured by this Court's appointment of counsel in these proceedings.

■ Father's second Due Process argument presents a different issue. In analyzing whether Due Process standards have been violated, the United States Su-

preme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) has set forth three factors to be considered:

(1) The private interest that will be effected by the official action;

(2) The risk that there will be an erroneous deprivation of the interest for the procedures used in the probable value of any additional or substitute procedural safeguard; and

(3) The government interest involved including the added fiscal and administrative burdens that additional or substitute procedures would require.

These factors have been held applicable to consideration of due process interest in Termination of Parental Rights proceedings. *In re Heller*, Del.Supr., 669 A.2d 25 (1995). This analysis is equally applicable to due process considerations in dependency/neglect proceedings. The hearing on March 15, 2000 was not a Termination of Parental Rights proceeding. It was an Adjudicatory Hearing brought pursuant to 10 *Del.C.* Chapter 9. Applying the *Eldridge* factors, the Court notes that:

(1) The private interest that was affected was not the termination of Father's parental rights, but parental custodial rights;

(2) There was little, if any, risk of deprivation of Father's interest through the procedures utilized as both Father and Mother were incarcerated, and that absent evidence of some more appropriate alternative placement, the Court at that time had no alternative but to place the child in temporary protective custody with DFS. Therefore, in the absence of some alternative placement, evidence of which has not been presented to this Court in this proceeding, the Court does not understand how the decision of March 15, 2000 could

have been any different even had Father not stipulated to the placement of G.Jr. in DFS custody at that time; and

(3) Father's suggestion that a dependency/neglect custody hearing under 10 *Del.C.* Chapter 9, requires he be informed of the existence of a termination of parental rights statute which creates the possibility that in some unspecified time in the future based upon numerous statutorily created conditions that the State might seek to terminate parental rights in the event that the child and Father were not eventually reunified, places an unreasonable burden upon the State.

While Father cites a number of cases for this Court to consider, the Court does not find them persuasive as they either apply to proceedings other than dependency/neglect, custody or termination of parental rights cases, or are based upon specific state statutory provisions not present in Delaware. By way of contrast a case involving a different type of proceeding but a strikingly similar issue, is *Barkley v. State,* Del.Supr., 724 A.2d 558 (1999). In *Barkley,* the Delaware Supreme Court was called upon to determine whether the automatic revocation of driving privileges that is required to be imposed at the time of sentencing for certain drug offenses mandates that the Defendant be made aware of those consequence prior to the acceptance of a guilty plea. In holding that such information must be provided to the defendant, the Delaware Supreme Court entered into a detailed analysis regarding the issue of *direct v. indirect* consequences. In analyzing a multitude of criminal cases, the Supreme Court adopted a definitional distinction between the two, holding that a *direct* consequence

requiring advance notice is one that has a "definite immediate and largely automatic effect" while *indirect* or *collateral* consequence is one that merely poses a potential result. The Court made a specific distinction between automatic revocation of driving privileges, and potential revocation under other statutes, such as the habitual driving offense statute, 21 *Del.C.* § 4177 K(a), in which the defendant is afforded a separate administrative proceeding undertaken before his privileges are revoked. Applying a similar analysis to dependency/neglect custody cases such as this one, the March 15, 2000 Adjudicatory Hearing in which temporary custody of G.Jr. was placed with DFS as the result of his being a dependent child within the meaning of 10 *Del.C.* § 901(8) was the beginning point in the child's placement and therefore a necessary element in the establishment of grounds for Termination of Parental Rights on the basis of failure to plan under 13 *Del.C.* § 1103(a)(5). However, Termination of Parental Rights cannot be effectuated without the filing of a distinctly separate Petition, the Court conducting an entirely separate judicial hearing and the Court making specific findings by clear and convincing evidence as to a multitude of facts unrelated to the findings that supported the Dependency/Neglect Custody Order of March 15, 2000. As such, TPR is an *indirect* consequence rather than a *direct* consequence of Father's agreeing to DFS custody on March 15, 2000, and therefore his failure to be advised of the potential for Termination of Parental Rights was not a violation of Father's Due Process guarantees.

The Court will now turn to the issue of whether the statutory grounds for Termination of Parental Rights have been established. DFS seeks to Respondents' parental rights on the basis of "failure to plan"

as specified in 13 *Del.C.* § 1103(a)(5)[4].

Because parental rights arise from a natural relationship which the law has traditionally recognized as fundamental liberties, these rights may not be abrogated in the absence of the most compelling reasons. *In re: Kelly Stevens,* Del.Supr., 652 A.2d 18 (1995), *In re: Burns,* Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Child Protective Services,* Del. Supr., 470 A.2d 723, 726 (1983). In Delaware, the statutory scheme requiring proof of both an enumerated statutory ground and a determination that severing the parental tie would be in the child's best interest has been recognized by our courts

to require "a showing, by clear and convincing evidence, that the parent is unable to meet the statutes guidelines". *In re Hanks,* Del.Supr., 553 A.2d 1171, 1178 (1989). This is a higher standard of proof than the often-used "preponderance of the evidence" standard and helps guarantee that a parent only sacrifices their sacred right when the parent has clearly failed to fulfill their equally sacred obligation to the child. *Patricia A.F. v. James R.F.,* Del. Supr., 451 A.2d 830, 831 (1982).

This child has been in care of the Department for more than one year. During this period both parents, plagued with drug addiction, were repeatedly incarcer-

4.  13 *Del.C.* § 1103(a)(5) states in relevant part:

    "(a) The procedure for Termination of Parental Rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of a child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist:

    (5) The parent or parents of the child, or any person or persons holding parental rights over the child are not able, or have failed to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met:

    a.  In the case of a child in the care of the Department or a licensed agency:
    1. The child has been in the care of the Department or licensed agency for a period of 1 year, or for a period of 6 months in the case of a child who comes into care as an infant, or there is a history of previous placement or placements of this child; or 2. There is a history of neglect, abuse or lack of care of the child or other children by the Respondent; or 3. The Respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration, except that the Court may consider post-conviction conduct of the respondent; or 4.

    the Respondent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the Respondent's financial means; or 5. failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child. In making a determination under this paragraph, the Court shall consider all relevant factors, including:

    A.  Whether the conditions that led to the child's placement, or similar conditions of a harmful nature, continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the Respondent to discharge parental responsibilities so that the child can be returned to the Respondent in the near future;

    B.  The Respondent's efforts to assert parental rights of the child, and the role of the other persons in thwarting the Respondent's efforts to assert such rights.

    C.  The Respondent's ability to care for the child, the age of the child, the quality of any previous relationship between the Respondent and the child or any other children;

    D.  The effect of a change of physical custody on the child;

    E.  The effect of a delay in termination of the chances for the child to be placed for adoption...."

ated for violating terms of their probations relating to drug use. Indeed, Respondents' drug dependence is the essential factor around which all other issues relating to their failure to plan for G.Jr. revolve. The stability of the Respondents relationship and their ability to care for G.Jr. was, as established by the evidence in this case, undermined primarily, if not exclusively by the effects that their drug dependence had on their lives. As such, DFS was under a duty to develop a meaningful Plan supported by appropriate services designed to assist Respondents in meeting the Plan goals. The Court does not believe that the evidence establishes that the State developed such a meaningful Case Plan by following a process which would help these parents be reunited with their child and as such, the Court cannot find that the State has made reasonable efforts to reunify the family or prevent placement.

■ The seriousness of Mother's drug addiction was apparent early in G.Jr.'s placement. When Mother was discharged for non-compliance with the treatment plan by Brandywine Counseling, Inc. on April 10, 2000, specific instructions were given that Mother not be readmitted until she had completed an in-placement drug treatment program. Notwithstanding this recommendation by DFS's own drug treatment professionals, Petitioner continued to provide Mother with Case Plans requiring Mother to demonstrate her ability to stay clean of drugs yet offering Mother nothing beyond referrals for out-patient treatment already deemed to be ineffective in treating Mother's needs. No evidence was presented by Petitioner as to what attempts, if any, it made to place mother in residential treatment. Mother's intentional consumption of alcohol and reporting of the violation of probation to her P.O. demonstrates Mother's frustration with the lack of support being provided her by DFS. The evidence supports Mother's position that, in her way of thinking, it was better to be incarcerated and receive residential treatment than be out on the street being directed to treatment designed to fail.

Father's, situation is somewhat similar, although lacking in the early recommendation for in-patient treatment. Following unsuccessful out-patient treatment, Father finally addressed his drug addiction while incarcerated on violation of probation. It appears that since his release, Father has been drug free, removed himself from the environment presenting Father with drug temptation, relocated to Dover where he benefits from a family support network, obtained housing and regular employment. He has sought out and is prepared to provide G.Jr. with appropriate day care once the opportunity is presented to him, and appears to be doing the very things that would have justified G.Jr.'s reunification with him had Father's drug problem been addressed in a timely fashion. While Father clearly is not without blame in this regard, the evidence if not clear and convincing to the Court that the delay in Father's rehabilitation was not substantially the result of the failure of Petitioner to make reasonable efforts to provide appropriate services to Father in the first place.

■ Having concluded that the evidence does not establish that the State developed a meaningful case plan to help these parents be reunited with their child nor that the State made reasonable efforts to reunify the family, the Court's analysis could conclude here without addressing the issue of the child's best interest. However, even if the State had established that it had provided Respondents' with an appropriate case plan and made reasonable efforts to reunify, the Court does not believe that the evidence establishes that it is in G.Jr.'s best interest at this time that his relation-

ship with his parents be severed in favor of adoption. Both parents interaction with G.Jr. was always deemed to be appropriate. He was never abused. He was never abandoned. G.Jr. appears to be a loving happy child who has adapted to his prior placements. His most recent placement was for the purposes of adoption. As the pre-adoptive family has chosen not to pursue adoption, G.Jr. will be facing at least one further disruption as he again is forced to adjust to a new home. Inadequate evidence was presented to enable this Court to conclude that that adjustment could occur just as well in the home of Respondent Father as in the pre-adoptive home of an as yet unidentified family. Assuming a plan which includes an appropriate period of visitation increasing over time until it transitions into residential placement, the facts of this case supports the conclusion that G.Jr. may be just as well off reunited with Father and eventually Mother upon her release from incarceration. This is not a case where the evidence supports the conclusion that the child's best interests are served by termination of his parents' parental rights.

For this additional reason, the Petition for Termination of Parental Rights must be denied.

### CONCLUSION

The Court having determined that the State has failed to prove by clear and convincing evidence that it has made reasonable efforts to reunify this family or that the State developed a meaningful Case Plan designed to achieve that goal, thereby requiring the Court to deny this Petition to Terminate Parental Rights, the attention of the parties and the Court must now turn to the matter of rebuilding the relationship between child and parent. Petitioner is directed to begin the process of developing a Case Plan for reunification of this child with Father and a Child in Care Plan in anticipation of the scheduling of a hearing to consider the appropriateness of these Plans. The Court will contact counsel within the next two weeks regarding the scheduling of a date for the Review Hearing to consider such plans.

**IT IS SO ORDERED:**