CRAWLEY, Judge.
R.K.J. (“the mother”) and J.D.J. (“the father”) were married in 1995, divorced for the first time in December 2001, remarried in February 2002, and separated for the second time in May 2002 after an altercation that resulted in the father’s arrest for domestic violence. The mother was awarded custody of the parties’ two children as the result of an ex parte proceeding when she sued for divorce in late May. The father requested pendente lite custody when he answered the mother’s complaint. On June 20, 2002, the trial court entered a pendente lite order setting aside his ex parte custody order and awarding custody of the children to the father. After the divorce trial, the trial court awarded custody of the children to the father. That judgment awards the mother supervised visitation at reasonable times and places. The mother appeals, arguing that the trial court erred in awarding custody of the children to the father or, in the alternative, in failing to award her specific visitation.
At the time of the parties’ separation, the mother alleged that the father had sexually abused the children. She reported that the children told her that the father and his girlfriend, who the children named as M.S., had sexually abused the children in the marital residence and that the father and M.S. had a child that the children had been to visit. The mother’s allegations were determined by the Department of Human Resources (“DHR”) to be “not indicated.”
Two DHR caseworkers testified at trial. Phyllis Cook testified regarding her interviews with the mother and the children. She found the mother to be very upset and noted that the mother talked excessively during the interviews. She said that the mother would not answer questions posed to her but continued to talk about the sexual-abuse allegations. Cook said that, *917 based on her interviews with the mother, she concluded that the mother was emotionally unstable, but, as her training required, Cook continued to investigate the mother’s allegations that the children had been sexually abused. The mother reported to Cook that she had taken the children to Walker Baptist Hospital on June 9, 2002, and then to Children’s Hospital on June 13, 2002. Cook said that she instructed the mother not to take the children for further exams; however, the mother took the children to Cullman Hospital at a later date.
Cook described the children as being coached. She indicated in her report that the children’s mannerisms and expressions did not correspond with the events they were relating and that it seemed that the older child, a six-year-old daughter, considered what she was saying was a story. The reports from both Walker Baptist Hospital and Children’s Hospital indicated that no physical evidence of abuse was present. In addition, according to Cook, when she showed a photograph of M.S. to the children, they did not recognize M.S. The children described the woman who abused them as a tall woman with long, straight blond hair; according to Cook, M.S. was approximately five feet two inches tall and had curly hair.
Finally, Cook testified that the mother became angry and accused Cook of “picking up” her children for no reason. The mother even reported Cook to the State DHR office. However, as Cook said she attempted to explain to the mother, DHR did not pick up the children; instead, their custody was awarded to the father by the trial judge.
Gloria Perry, another DHR caseworker, also testified. She interviewed the father, the paternal grandfather, and a neighbor of the parties. She testified that the father reported to her that he had moved in with his parents and that he did not have a girlfriend. He explained that M.S. was a high-school girlfriend and that he had not seen her in about seven years. According to Perry, the neighbor discussed with her what he witnessed the night the mother had the father arrested for domestic violence. He said that the father was more “beat up” than the mother and that he had concerns about the mother because she had spoken of being afraid that people were watching her and following her. Perry also reported that the social worker at Children’s Hospital had indicated to her that the.mother and her sister, who was with the mother at the time the children were brought to the hospital, were acting irrationally and that the mother and the children’s interactions raised some concerns to the social worker; however, Perry did not elaborate on those concerns.
Dr. Ronald Bray, a psychologist, examined the mother. He testified that he had given the mother some traditional diagnostic tests, including the Minnesota Multi-Phasic Inventory and the Parenting Stress Index, and that none of the testing had indicated that the mother suffered from any mental illness. He said he had no concerns about her ability to parent the children.
Carolyn Ryland, the mother’s sister, testified that the mother had been the primary caregiver for the children. She said that she had never seen the father without a drink in his hand. She testified that she had seen bruises on the mother’s legs, hips, and arms. She also reported that she had seen the father slap the mother on her buttocks; she denied that the slap was affectionate or playful.
The mother testified that the father was abusive at times during the marriage. She said he was abusive only when he had been drinking. The mother testified that she was only a social drinker. She admitted *918 that she took the prescription medication Xanax on occasion; she denied abusing the drug. She also admitted, upon cross-examination, that she sometimes took drugs or drank beverages containing caffeine. She denied, however, taking a “handful” of caffeine pills. The mother denied coaching the children about the sexual-abuse allegations. She said that she thought the children had gotten the girlfriend’s name wrong. She said that she had heard that the father’s girlfriend was named K.P. and that he and K.P. had a child.
The father works swing shifts at a U.S. Steel plant. He testified that he had hit the mother on two occasions in self-defense. He said that the mother had severe mood swings and that she often became violent. He testified that her violent outbursts usually began with an accusation of his infidelity. According to the father, the mother often accused him of infidelity; he stated at trial that, if the mother’s accusations were to be believed, “I reckon I’ve slept with everybody in Walker County.” The father testified that he had never been unfaithful to the mother. The father denied having a drinking problem, but he did admit to having one driving-under-the-influence conviction.
The father described the incident that resulted in his arrest for domestic violence. He said that it began with the mother’s accusation of infidelity, followed by her throwing a coffee table at him as he walked away from the argument. He said that the mother then grabbed him by the hair at the back of his neck and jerked his head back. He said that, in reaction, he turned around and slapped her. He testified that he then left; upon his return a few hours later, he was arrested.
The father lives with his parents. His father (“the grandfather”), was required to supervise the mother’s visitation by the pendente lite custody order. He testified at trial that the children were happy; that the daughter was a straight-A student; and that the son was a typical five-year-old boy, playing and “into everything.” He admitted that the father’s work schedule was hectic, but he denied that the father did not have an opportunity to spend time with his children. The grandfather said that he would be willing, if the father received custody, to help out with the children as he had been doing. When questioned about the mother’s visitation, the grandfather admitted that he had at times denied the mother visitation. He said that he had denied visits because he was concerned that the mother might have someone present during visitation that he felt the children should not be exposed to.
The mother argues on appeal that the father should not have been awarded custody or, in the alternative, that the trial court should have set out a specific visitation schedule. Because this was an initial custody determination, the parties are on equal footing and the trial court must base its decision on what it determines would be in the best interest of the children. Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994). Our review in such cases is very limited. Smith v. Smith, 448 So.2d 381, 383 (Ala.Civ.App.1984) (stating that an appellate court should disturb the trial court’s custody judgment only in cases involving a clear and palpable abuse of discretion).
The mother made serious allegations against the father that were not proven to be true. In addition, testimony at trial indicated that the mother may have been emotionally unstable, as evidenced by the father’s testimony that the mother continually accused him of infidelity despite a lack of evidence and his denials of extramarital affairs. The father did admit that he had hit the mother on two occasions; *919 however, he testified that he had hit the mother in self-defense on both occasions. As the mother points out, Ala.Code 1975, § 30-3-131, provides a rebuttable presumption against placing the custody of a child with a perpetrator of domestic violence. The trial court observed the parties’ demeanor, heard their testimony, and made credibility determinations based on its observations. See Long v. Long, 824 So.2d 778, 781 (Ala.Civ.App.2001). From the evidence presented, it could have found either that the father was not a perpetrator of domestic violence or that he had rebutted the presumption provided in § 30-3-131. The trial court had evidence from which it could have concluded that the children’s best interests would be served by placing them in the father’s custody. Accordingly, we affirm the trial court’s award of custody to the father.
The trial court’s visitation award, however, is not as easily insulated from reversal. The trial court’s judgment awards the mother supervised visitation “at reasonable times and places.” Although the trial court has a wide degree of discretion in visitation matters, and although its decision on such matters will not be overturned absent a clear and palpable abuse of that discretion, see Anonymous v. Anonymous, 620 So.2d 43, 44 (Ala.Civ.App.1993); Baugh v. Baugh, 567 So.2d 1358 (Ala.Civ.App.1990), we have reversed trial court judgments for failing to set out a specific visitation schedule. See K.L.R. v. L.C.R., 854 So.2d 124 (Ala.Civ.App.2003); K.L.U. v. M.C., 809 So.2d 837 (Ala.Civ.App.2001); Bryant v. Bryant, 739 So.2d 53 (Ala.Civ.App.1999). Of the aforementioned cases, the one most similar to this case is K.L.R., in which the trial court’s judgment awarded the mother “ ‘the right of reasonable access of visitation.’ ” K.L.R., 854 So.2d at 133. As we indicated in K.L.R., an award of “reasonable visitation” without specific minimum guidelines for that visitation is quite similar to allowing one parent to determine where and when visitation should take place, as was the case in the judgments in both K.L. U. and Bryant.
In both types of cases, the custodial parent would have the ability to deny visitation on the grounds that it was not “reasonable.” Such a situation places too much control over the noncustodial parent’s relationship with the children in the hands of the custodial parent. In addition, such a visitation judgment is likely to increase the chances of further litigation over visitation matters. The trial court’s judgment in the present case suffers from the same fatal flaw as the judgments in K.L.R., K.L.U., and Bryant. Therefore, we reverse the trial court’s judgment insofar as it fails to set forth a specific visitation schedule for the mother. On remand, the trial court is instructed to fashion a specific visitation schedule for the mother, taking into account all necessary information.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur.