897 So.2d 379 (2004)
K.B.
v.
CLEBURNE COUNTY DEPARTMENT OF HUMAN RESOURCES and intervenors, L.S. and A.S.
2030420.
Court of Civil Appeals of Alabama.
October 1, 2004.
*380 Joshua J. Lane, Anniston, for appellant.
Debra H. Jones, Anniston, for appellees/intervenors L.S. and A.S.
*381 THOMPSON, Judge.
In February 2002, the Cleburne County Department of Human Resources ("DHR") removed A.C., T.N., and K.N. from the home of K.B. ("the mother") and J.B. ("the stepfather") based on allegations that the children had been left alone with a mentally retarded friend or relative who had physically abused them. At that time, A.C., a daughter, was 11 years old; T.N., a son, was 9 years old; and K.N., a daughter, was 5 years old. T.N. and K.N. are A.C.'s half siblings.[1] The record indicates that DHR obtained custody of the children and placed the children in the home of A.S. and L.S., the children's maternal aunt and uncle; the aunt and uncle have a child of their own, a son ("the cousin"), who was approximately 8 years old at the time the children were placed with them. The record further indicates that the trial court adjudicated the children to be "dependent" within the meaning § 12-15-1(10), Ala.Code 1975.
In May 2002, the aunt and uncle simultaneously filed a motion for temporary custody of A.C. and a petition for custody of or, in the alternative, placement of A.C. The aunt and uncle did not seek custody of T.N. and K.N.; instead, they sought to be relieved of custody of T.N. and K.N. due to their characterization of those children as "special needs" children. The aunt and uncle alleged, among other things, that they had a "special relationship" with A.C., that A.C. had spent a significant amount of time with them during her lifetime, and that the mother was unfit to have custody of A.C.[2] The mother filed a motion to dismiss the aunt and uncle's petition for custody. The mother alleged, among other things, that DHR intended to return all three children to her and that she was fit to have custody of A.C.
The record indicates that T.N. and K.N. were returned to the mother's home in May 2002 and that the trial court later transferred custody of T.N. and K.N. to the mother. The trial court entered an order on May 30, 2002, ordering that A.C. remain in the home of the aunt and uncle pending an emergency hearing to determine the temporary placement of A.C.
Over the next 18 1/2 months, the trial court held four hearings and ruled on a number of motions in this matter before entering a judgment on December 17, 2003, transferring custody of A.C. to the aunt and uncle. The record on appeal includes transcripts from hearings held on July 17, 2002, August 22, 2002, December 13, 2002, and September 5, 2003; the trial court received ore tenus evidence at all of the hearings except the August 22, 2002, hearing. The mother, the aunt and uncle, and DHR were represented by counsel at all of the hearings; A.C.'s guardian ad litem attended all of the hearings. A detailed recitation of the testimony offered at those hearings is not necessary or appropriate for the disposition of this appeal; however, we briefly summarize the most pertinent testimony below.
At the July 17, 2002, hearing, the following witnesses testified: A.C., A.C.'s father, DHR caseworker Lisa Camp, and the uncle. *382 A.C. testified that she had spent a significant amount of time during her lifetime with the aunt and uncle and that she wanted to continue to live with them because they loved her and took good care of her. A.C. also testified that she did not get along with the mother, that she did not feel comfortable in the mother's home, that she was afraid of getting head lice in the mother's home, and that she did not want to visit with the mother under any circumstances.
A.C.'s father testified that he believed that the aunt and uncle's home was a good place for A.C. A.C.'s father also testified that the stepfather "pulls guns on the children"; the uncle testified that the stepfather was a "big issue." A.C.'s testimony indicated that the stepfather had acted somewhat abusively and violently in the past and that A.C. was afraid of the stepfather.
All the parties agreed to admit the report of Dr. David Wilson, a psychologist, into evidence. In that report, Dr. Wilson recommended that A.C. not be forced to live with the mother and opined that it was in A.C.'s best interests to remain in the home of the aunt and uncle at the present time.
DHR caseworker Lisa Camp testified that DHR's goal was to reunite all three children with the mother; however, she admitted on cross-examination that based on Dr. Wilson's report, DHR did not recommend that A.C. be returned to the mother at the time of the July 17, 2002, hearing. Camp further testified that although T.N. and K.N. initially did not want to return to live with the mother, they were presently "doing fine" in the mother's home. Camp also testified that she believed the aunt and uncle were alienating A.C. from the mother and that there had been problems arranging visitation between A.C. and the mother. The uncle agreed that there had been problems arranging visitation.
At the close of the July 17, 2002, hearing, the trial court orally entered an order continuing temporary placement of A.C. with the aunt and uncle; the trial court also admonished the aunt and uncle for failing to cooperate with DHR and advised them that their continued failure to do so could possibly result in A.C. being transferred to a foster home. The trial court also addressed with the mother the seriousness of the deterioration of the mother/daughter relationship and encouraged the mother to work with the psychologist to rebuild that relationship. The trial court ordered that visitation between A.C. and the mother be resumed gradually. The record indicates that DHR subsequently arranged weekly one-hour supervised-visitation sessions at their offices on Friday afternoons.
Counsel for all of the parties and the guardian ad litem updated the trial court regarding the status of the case at the August 22, 2002, hearing. The record indicates that most of the discussion at that hearing involved visitation issues and the necessity for counseling to help rebuild the shattered mother/daughter relationship. The record indicates that visitation had been occurring weekly at DHR's offices, and that, although DHR and the guardian ad litem believed the visitation sessions had been going well, the aunt and uncle believed that the visitation sessions had not been going well. On the same date as that hearing, the trial court entered an order that, among other things, continued temporary placement of A.C. with the aunt and uncle and ordered counseling to help rebuild the mother/daughter relationship.[3]
*383 In September 2002, DHR filed a motion to be relieved of custody of A.C. In its motion, DHR alleged, among other things, that its reunification efforts regarding the mother and A.C. had been frustrated and that it believed A.C. would be "safe, and have her needs met" in the custody of either the mother or the aunt and uncle. The record also indicates that sometime before the December 13, 2002, hearing, the mother requested that the trial court remove A.C. from the aunt and uncle's home and place her in a different foster home in order to facilitate A.C.'s reunification with the mother.
The following witnesses testified at the December 13, 2002, hearing: Carol Windom, A.C.'s teacher; Dr. James Robert Reaves, Jr., A.C.'s therapist; Darlene Davis, a licensed counselor; A.C.; A.C.'s father; the mother; and other family members and friends. Carol Windom testified that she had known the aunt all of her life and that she and the aunt taught at the same school where Windom was currently A.C.'s teacher. Windom testified that A.C. was an excellent student. Windom's testimony indicated that she believed the aunt exhibited good parenting skills with A.C.
Dr. Reaves, A.C.'s therapist, testified that he had had 9 or 10 one-hour counseling sessions with A.C. Dr. Reaves opined that to remove A.C. from the aunt and uncle's home at the time of the December 13, 2002, hearing would be incredibly detrimental to A.C.'s health. Dr. Reaves testified that A.C. was extremely close to her cousin and that A.C. perceived her family unit to be the aunt and uncle and the cousin. Dr. Reaves further testified that A.C. had been traumatized by witnessing her previous stepfather's suicide, that A.C. was resentful of the way she perceived the mother had treated her over the years, that she was fearful of her current stepfather and fearful that the mother would not protect her from the stepfather. Although Dr. Reaves discussed parental alienation syndrome, he stated that he had not found any evidence that the aunt or uncle were alienating A.C. from the mother.
A.C. testified that she was 12 years old at the time of the December 13, 2002, hearing and that although she loved the mother she still did not want to visit with the mother. A.C. further testified that she was afraid of visiting with the mother at the mother's home because she was fearful of the stepfather and of being contaminated with head lice. A.C. also testified that she had been visiting with the mother and T.N. and K.N. on Friday afternoons at DHR. A.C. claimed that the mother had brought a friend to several of the visitation sessions and that the friend had hit her on one occasion; that friend testified later during the hearing and denied hitting A.C. On cross-examination by counsel for DHR, A.C. agreed the she would be willing to visit with the mother if the aunt and uncle were awarded custody of her and the "whole court thing" was over. A.C. confirmed that position when questioned by the trial court.
Both A.C.'s father and A.C.'s paternal grandfather testified that they believed the aunt and uncle's home was a good placement for A.C.; they requested that the trial court permit A.C. to remain in the aunt and uncle's home. The paternal aunt who had custody of A.C.'s older sister and A.C.'s older sister also testified; their testimony tends to establish that neither of them get along with the mother and that A.C.'s older sister and the mother do not have a mother/daughter relationship.
Darlene Davis, a licensed counselor, testified that she had counseled A.C., as well *384 as K.N. and T.N., after DHR had obtained custody of them in February 2002. The record indicates that she had had approximately 10 one-hour counseling sessions with A.C. Davis opined that A.C.'s behavior was consistent with that of a child who had been alienated from a parent; Davis believed that the mother and the aunt and uncle were all culpable to some extent. However, she did not believe that A.C. should be removed from the aunt and uncle's home at the present time; she believed that to do so would emotionally damage A.C. and could lead to depression and other behavioral problems. Davis shared many of the same concerns as Dr. Reaves and further opined that the deterioration of the mother/daughter relationship was "severe" and that A.C. and the mother were extremely close to the "point of no return" in rebuilding their relationship.
The mother testified that she wanted A.C. removed from the aunt and uncle's home and placed in a different foster home; the mother further testified that she would not be comfortable having unsupervised visits with A.C. at the present time. The mother testified that A.C. had made it clear to her during recent visits that "[A.C.] doesn't want anything to do with me at this time." When asked on direct examination if she would agree to Dr. Reaves's and Davis's recommendations that custody be awarded to the aunt and uncle and that she be awarded visitation rights in a therapeutic setting, she responded, "no."
After the December 13, 2002, hearing, the trial court entered an order denying DHR's motion to be relieved of custody; denying the mother's motion to place A.C. in another foster home; and denying the aunt and uncle's petition for custody or placement as to the request for custody but granting that motion as to placement.
In June 2003, the mother filed a motion seeking the return of custody of A.C. to her. In her motion, the mother alleged, among other things, that A.C. was no longer dependent; that the mother was fit to have custody of A.C.; and that it was in A.C.'s best interest for the trial court to grant custody of A.C. to the mother. The aunt and uncle answered and counterclaimed, also seeking custody of A.C. In their counterclaim, the aunt and uncle alleged, among other things, that A.C. was dependent, that the mother and A.C. did not have a mother/daughter relationship, that they were fit to have custody of A.C., and that it was in A.C.'s best interest for the trial court to grant them custody of A.C. DHR also filed a response, alleging that although it did not believe the mother was unfit, it believed it would be emotionally traumatic for A.C. to be removed from the aunt and uncle's home.
At the September 5, 2003, hearing, DHR social worker Lisa Camp, the mother, and the aunt testified. Although A.C. did not testify, the parties stipulated that A.C.'s testimony would be substantially the same as it was at the December 13, 2002, hearing.
Camp testified that T.N. and K.N. had recently been removed from the home of the mother and the stepfather on August 25, 2003, after DHR received a report from the children's school that the school officials suspected that the children had been physically abused. The record indicates that the stepfather spanked T.N. and K.N. with a hickory stick after they had repeatedly disobeyed the mother and the stepfather's instructions not to cross the street. The mother was present when the stepfather administered the spankings. Although the mother admitted that the marks on T.N.'s and K.N.'s legs indicated that they were spanked more severely than necessary, she also stated that T.N. *385 and K.N. had not crossed the street since the spankings. T.N. and K.N. were returned to the mother after she agreed to have the stepfather move out of the home; the mother testified that she planned to divorce the stepfather. Although T.N. and K.N. were returned to the mother's home, the mother and the stepfather were still under investigation  the mother for neglect and the stepfather for physical abuse.
Camp testified that Donna Crow, a counselor who had been working with A.C. and the mother, advised Camp that reunification counseling was not working and was no longer beneficial. Camp testified that there was little interaction between A.C. and the mother during the weekly supervised visitation sessions at DHR's offices and that A.C. spent most of her time visiting with T.N. and K.N. Camp further testified that A.C. claimed that the mother had recently stated to her during one of those visitation sessions that the mother intended to "whip her a* *" when she regained custody of her. Camp testified that she did not believe that it was in A.C.'s best interests at the present time to be returned to the mother's home. Camp testified that DHR recommended that A.C. remain in the home of the aunt and uncle and that the mother be granted structured, supervised visitation rights.
The mother testified that she currently had supervised visitation with A.C. for one hour on Friday afternoons at DHR's offices and unsupervised visitation in the mother's home every other Saturday from 10:00 a.m. to 5:00 p.m. The mother complained that she was not getting a full seven hours of Saturday visitation. The record indicates that although visitation was canceled from time to time by either the mother or the aunt and uncle for a variety of reasons, visitation was occurring. The record indicates that the mother and A.C. were not spending very much one-on-one time with each other.
The mother testified that she lives in a double-wide manufactured home located on a dirt road and that she can provide for A.C.'s needs. The mother testified that during one of the counseling sessions with Crow, A.C. stated that she loved the mother. The mother testified that A.C.'s attitude of not wanting to be around her arose after A.C. was placed in the home of the aunt and uncle in February 2002.
The aunt testified that she wanted A.C. to visit with T.N. and K.N., and that she wanted A.C. to have supervised visitation with the mother but she did not want visitation with the mother to interfere with A.C.'s school activities and A.C.'s being with her friends.
The December 17, 2003, judgment states, in pertinent part:
"1. The petition to return custody is hereby denied.
"2. The child is dependent, with DHR having custody; and placement is now with the Intervenors, the maternal aunt and uncle, [L.S.] and [A.S.]
"3. Based upon the totality of the circumstances surrounding this child and her relationship with her natural mother ([K.B.]), the Court finds there is not a nurturing relationship between the mother and the child, and that in spite of the reasonable efforts by [DHR], the natural mother, and the counselors, to establish and improve such a relationship, the Court finds there is no relationship. Based upon this unique set of circumstances, the natural mother is found to be unfit to properly care of this child, [A.C.]
"4. The custody of A.C. is hereby transferred to the Intervenors, [L.S.] and [A.S.] They shall arrange periods of *386 visitation with the natural mother at all times and places the parties agree upon.
"5. [DHR] is hereby relieved of custody and supervision."
The mother filed a motion to alter, amend, or vacate the December 17, 2003, judgment, requesting that the trial court amend its judgment and grant her custody of A.C. or, in the alternative, grant her specific visitation rights to include regularly scheduled overnight weekend visitation, extended summer and Christmas visitation, as well as holiday and special occasion visitation. The mother also sought court-ordered mother/daughter counseling sessions to reestablish the mother/daughter relationship. The trial court denied the mother's postjudgment motion. The mother timely appealed.
This court's review of this matter is guided by the ore tenus rule. Our supreme court has stated:
"`When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination  it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein this Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993), set out the well-established rule:
"`"`Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).'"
"`....
"`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'"
Ex parte Patronas, 693 So.2d 473, 474-75 (Ala.1997) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324-26 (Ala.1996)) (emphasis added).
The mother contends on appeal that the trial court erred in transferring custody of A.C. to the aunt and uncle. In support of this contention, the mother argues that the trial court applied the wrong standard to the custody determination in this case. The mother argues that this case involves the disposition of a dependency action wherein the applicable standard for determining custody is the "best interests of the child"; the mother argues that the trial court incorrectly applied the "parental unfitness" standard under Ex parte Terry, 494 So.2d 628 (Ala.1986).
*387 In rendering its December 17, 2003, judgment, the trial court found A.C. to be "dependent." After a finding of dependency, the trial court was required to apply "[t]he `best interests [of the child]' standard ... in determining the disposition or placement of [A.C.]." J.A.P. v. M.M., 872 So.2d 861, 865 (Ala.Civ.App.2003) (citing S.T.S. v. C.T., 746 So.2d 1017 (Ala.Civ.App.1999)).[4] Although it appears that the trial court applied the more stringent Ex parte Terry"parental unfitness" standard, we conclude that implicit in the trial court's finding of the mother's unfitness was a determination that an award of custody to the mother was not in A.C.'s best interests. Accordingly, any use of the more stringent standard would constitute harmless error.
In the present case, the record contains an abundance of evidence from which the trial court could have concluded that A.C.'s best interests would be served by awarding custody of her to the aunt and uncle. Three counselors and DHR all recommended that it was in A.C.'s best interests to remain in the aunt and uncle's home. The record indicates that A.C. wants to remain in the aunt and uncle's home, that the mother and A.C. do not have a mother/daughter relationship, and that A.C. has a good relationship with the aunt and uncle. Accordingly, based on the ore tenus standard of review, see Ex parte Patronas, supra, the trial court's award of custody of A.C. to the aunt and uncle is due to be affirmed.
Next, the mother argues that, assuming the Ex parte Terry "parental unfitness" standard applies, the trial court erred in finding her to be unfit. Because we have already concluded that the trial court's award of custody is due to be upheld applying the "best interests of the child" standard, we do not address this argument further.
Lastly, the mother contends that, pursuant to the trial court's judgment, visitation is solely at the discretion of the aunt and uncle and that, given the adversarial relationship between the mother and the aunt and uncle, the trial court abused its discretion in fashioning the mother's visitation rights. The mother cites R.K.J. v. J.D.J., 887 So.2d 915 (Ala.Civ.App.2004); K.L.R. v. L.C.R., 854 So.2d 124 (Ala.Civ.App.2003); K.L.U. v. M.C., 809 So.2d 837 (Ala.Civ.App.2001); and Bryant v. Bryant, 739 So.2d 53 (Ala.Civ.App.1999), in support of her argument.
In awarding visitation rights relating to the disposition of a "dependent child" pursuant to § 12-15-71(a), the trial court is guided by the "best interests of the child" standard. See § 12-15-71(a)(4) ("If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child: ... (4) Make any ... order as the court in its discretion shall deem to be for the welfare and best interests of the child.").

*388 "`"The determination of proper visitation ... is within the sound discretion of the trial court, and that court's determination should not be reversed absent a showing of an abuse of discretion." Ex parte Bland, 796 So.2d 340 (Ala.2000). "[C]ases in Alabama have consistently held that the primary consideration in setting visitation rights is the best interests and welfare of the child. Furthermore, each child visitation case must be decided on its own facts and circumstances." Fanning v. Fanning, 504 So.2d 737, 739 (Ala.Civ.App.1987) (citations omitted). "When the issue of visitation is determined after oral proceedings, the trial court's determination of the issue will not be disturbed absent an abuse of discretion or a showing that it is plainly in error. Andrews v. Andrews, 520 So.2d 512 (Ala.Civ.App.1987)." Dominick v. Dominick, 622 So.2d 402, 403 (Ala.Civ.App.1993).'
"K.L.U. v. M.C., 809 So.2d 837, 840-41 (Ala.Civ.App.2001)."
K.L.R. v. L.C.R., 854 So.2d at 132.
In K.L.R. v. L.C.R., supra, the trial court awarded the mother visitation with the parties' minor children. However, rather than setting forth the specific time for that visitation, the trial court stated in its judgment "`[t]hat the [mother] shall have the right of reasonable access of visitation with the parties' minor children.'" 854 So.2d at 133. This court reversed, based on K.L.U. v. M.C., supra, and Bryant v. Bryant, supra. K.L.R. v. L.C.R., 854 So.2d at 133. In so holding, this court reasoned:
"In K.L.U. v. M.C., supra, the trial court awarded the father visitation with the parties' minor child. However, rather than setting forth the specific times for that visitation, the trial court allowed the parties to arrange visitation. The father appealed. This court reversed, holding that it was error for the trial court to allow the mother to determine the father's visitation schedule. K.L.U. v. M.C., supra. See also Bryant v. Bryant, 739 So.2d 53 (Ala.Civ.App.1999) (reversing the trial court's visitation award, which vested in the mother the total discretion to determine the father's visitation rights)."
K.L.R. v. L.C.R., 854 So.2d at 132-33.
Recently, in R.K.J. v. J.D.J., supra, this court, once again, reversed that portion of the trial court's judgment that failed to grant the noncustodial parent a minimal specific visitation schedule. In R.K.J. v. J.D.J., the trial court awarded the mother supervised visitation with the parties' minor children. However, rather than setting forth the specific time for that visitation, the trial court stated in its judgment that visitation was to occur "`at reasonable times and places.'" 887 So.2d at 916. This court reversed, based on K.L.R. v. L.C.R., supra, K.L.U. v. M.C., supra, and Bryant v. Bryant, supra, as well as Anonymous v. Anonymous, 620 So.2d 43, 44 (Ala.Civ.App.1993), and Baugh v. Baugh, 567 So.2d 1358 (Ala.Civ.App.1990) (both reversing trial court judgments for failing to set out a specific visitation schedule). R.K.J. v. J.D.J., 887 So.2d at 919. In so holding, this court reasoned, in part:
"As we indicated in K.L.R. [v. L.C.R.], an award of `reasonable visitation' without specific minimum guidelines for that visitation is quite similar to allowing one parent to determine where and when visitation should take place, as was the case in the judgments in both K.L.U. [v. M.C.] and Bryant [v. Bryant].

"In both types of cases, the custodial parent would have the ability to deny visitation on the grounds that it was not `reasonable.' Such a situation places too *389 much control over the noncustodial parent's relationship with the children in the hands of the custodial parent. In addition, such a visitation judgment is likely to increase the chances of further litigation over visitation matters. The trial court's judgment in the present case suffers from the same fatal flaw as the judgments in K.L.R. [v. L.C.R.], K.L.U. [v. M.C.], and Bryant [v. Bryant]."
R.K.J. v. J.D.J., 887 So.2d at 819.
In the present case, the trial court's judgment stated that the aunt and uncle "shall arrange periods of visitation with the... mother at all times and places the parties agree upon." Although A.C. did not testify at the September 5, 2003, hearing, the parties stipulated that A.C.'s testimony would be substantially the same as it was at the December 13, 2002, hearing. And, as previously stated, although A.C. testified at the December 13, 2002, hearing that she did not want to visit with the mother, she admitted on cross-examination by counsel for DHR that she would want to visit with the mother if the aunt and uncle were awarded custody of her and the custody matter was settled. A.C. confirmed that position when questioned by the trial court. Given the strained relationship between the mother and the aunt and uncle, the previous difficulties with visitation, and the likelihood that little or no visitation will occur if left to the discretion of the aunt and uncle, and based on the authority of R.K.J. v. J.D.J., supra, K.L.R. v. L.C.R., supra, K.L.U. v. M.C., supra, and Bryant v. Bryant, supra, we conclude that the trial court abused its discretion in failing to set forth a specific schedule for the mother's visitation with A.C. Accordingly, we reverse that portion of the trial court's judgment that relates to visitation. On remand, the trial court is instructed to fashion a specific visitation schedule for the mother, taking into account all necessary information. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, with writing.
MURDOCK, Judge, concurring in the result.
I cannot agree with the view expressed in the main opinion that the trial court's findings regarding the mother's unfitness necessarily indicate that the trial court applied the standard announced by our Supreme Court in Ex parte Terry, 494 So.2d 628 (Ala.1986), for custody disputes between a parent and a nonparent. Nor do I agree that the trial court's finding that the mother was unfit indicates that the trial court applied a standard that is overly "stringent" or otherwise inappropriate. In sum, unlike the main opinion, I see no "error," harmless or otherwise, in the trial court's judgment in this regard.
It appears that this issue has been generated unnecessarily by the mother's misunderstanding of what is required of trial courts in dependency cases. The mother states in her brief that "A.C. had been found dependent by the trial court prior to L.S. and A.S.'s petition for custody.... In such instances, the trial court need only to determine what is in the child's best interests." (Emphasis added.) The mother's argument fails to take into consideration the fact that, in order to make a disposition of a child in the context of a dependency proceeding, the child must in fact be dependent at the time of that disposition. See § 12-15-65(d) and (f), Ala.Code 1975; § 12-15-71(a), Ala.Code 1975; and Phillips *390 v. Alabama Dep't of Pensions & Sec., 394 So.2d 51, 52-53 (Ala.Civ.App.1981) ("The court, in finding the allegations of a petition in a juvenile proceeding to be true, necessarily finds the child to be either `dependent,' `delinquent' or `in need of supervision.' See, §§ 12-15-52, 65, Code of Alabama (1975)."). In other words, a finding of dependency is inherent to any dispositional order under § 12-15-71(a). Whether a child "had been" found dependent at some earlier time (in this case, the last trial-court order implicitly making a finding of dependency before the dispositional order at issue was a "Dependency Review Order" entered on August 14, 2003; the dispositional order at issue was entered on December 17, 2003) would have been immaterial if the child was no longer dependent at the time of the dispositional order. If the child no longer continued to be dependent at the time of the dispositional order, the trial court would have no authority to make any disposition of the child under our dependency statutes.
While it is true that, in making the dispositional decision regarding a dependent child, the court is governed by a "best interest" standard, see § 12-15-71(a), the test for dependency is not the child's best interest. Instead, a finding of dependency must be based upon the factors listed in § 12-15-1(10), Ala.Code 1975 (defining a "dependent child"). Those factors do in fact speak to the issue of parental unfitness, or in some cases neglect or abandonment, or other comparable problems giving rise to a compelling state interest in interfering with the natural parent/child relationship.[5]
Accordingly, I do not find the trial court's comments regarding the natural mother's unfitness to properly care for A.C. to be out of place. Absent an indication otherwise, we assume that a trial court has made the findings necessary to support its judgment. Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003). I cannot conclude that the trial court's judgment indicates that the explicit finding regarding the mother's unfitness necessarily spoke to anything other than the basis upon which the trial court considered the child to be dependent at the time that judgment was entered. Further, that finding certainly was relevant to the trial court's conclusion as to what disposition, as between the mother and other available options, would be in the child's best interest. I therefore cannot agree with the main opinion's acceptance of the premise of the mother's argument, i.e., that the trial court's judgment somehow reflects an application of an inappropriate standard. Nonetheless, because the main opinion finds the supposed error in the trial court's judgment to be harmless, and therefore affirms that judgment *391 insofar as it awards custody of A.C. to L.S. and A.S., I concur in the result reached by the main opinion.
With respect to the issue of visitation, the main opinion reverses the trial court's judgment because that judgment relegates visitation arrangements to the agreement of the parties. In so doing, the main opinion relies upon a number of divorce cases in which the issue of visitation rights are being settled between two parents. In dependency cases, however, the trial court's disposition of a child is governed by statute, i.e., § 12-15-71(a). This court has interpreted the power given to the trial court under § 12-15-71(a) "broadly to mean that its only parameter is the best interests and welfare of the child." Minchew v. Mobile County Dep't of Human Res., 504 So.2d 310, 311 (Ala.Civ.App.1987).
In the present case, it appears from its judgment that the trial court intended there to be periods of visitation between A.C. and her mother. Given the record presented in this case, including the evidence of the strained relationship of the parties and the previous difficulties with visitation, I agree that the trial court abused its discretion in leaving it to the parties to reach agreement between themselves as to the times, places, and duration of visitation. In addition, in light of the record before us, the trial court should determine whether the visitation is to be supervised.
NOTES
[1] The record indicates that the mother also has two children who are older than A.C., neither of whom are in the mother's custody. The record indicates that A.C.'s older sister has been living with the paternal aunt and uncle since August 2001 and that the trial court awarded the paternal aunt and uncle custody of A.C.'s older sister in early 2002. The record also indicates that A.C. has an older half brother who is in the custody of the maternal grandmother.
[2] The aunt and uncle also alleged that A.C.'s father was unfit to have custody of her; the record indicates that A.C.'s father did not seek custody of A.C.
[3] Also at the August 22, 2002, hearing, the trial court expressed concerns that A.C. was at risk of becoming a "run-a-way" if overnight visitation with A.C. was attempted.
[4] Regarding the disposition of a dependent child, § 12-15-71(a), Ala.Code 1975, provides that a trial court may:

"(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
"....
"(3) Transfer legal custody to any of the following:
"....
"c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.
"(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child."
[5] Those factors listed in § 12-15-1(10) that speak to a parent's unfitness or a parent's abandonment of his or her child would appear to be no less "stringent" than the standard announced in Ex parte Terry, 494 So.2d 628. In Ex parte Terry, our Supreme Court explained that the presumption in favor of a parent's right to the custody of his or her child is so strong that it may be overcome only by a showing of "unfit [ness]" or "voluntary forfeiture" on the part of the parent. Whether it is the state or an individual (other than the other parent), a "stringent showing" is necessary in order to overcome the fundamental right to family integrity and the resulting presumptive right of a parent to the custody, care, and control of his or her child. See generally D.M.P. v. State Dep't of Human Res., 871 So.2d 77 (Ala.Civ.App.2003) (plurality opinion) (discussing and quoting from Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976)); and Harper v. Jackson County Dep't of Pensions & Sec., 494 So.2d 428 (Ala.Civ.App.1986). See also R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001); L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only); and Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).