992 So.2d 34 (2008)
J.B. and S.M.
v.
CLEBURNE COUNTY DEPARTMENT OF HUMAN RESOURCES.
2061083.
Court of Civil Appeals of Alabama.
May 2, 2008.
*35 Debra H. Jones, Anniston, for appellants.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
THOMPSON, Presiding Judge.
J.B. ("the mother") and S.M. ("the father") appeal from a judgment of the trial court refusing their request for the return of custody of their daughter (hereinafter "the child"). We affirm.
On September 28, 2006, the mother took the child, who was one month old at the time, for a routine checkup. During that checkup, the doctor treating the child observed trauma to the child's head. X-rays of the child's head taken that same day revealed skull fractures on the left posterior side of the child's head. The child was immediately transferred to Children's Hospital in Birmingham for further treatment.
On October 2, 2006, the Cleburne County Department of Human Resources ("DHR") filed a petition alleging that the child was a dependent child pursuant to § 12-15-1(10), Ala.Code 1975, and seeking immediate, temporary custody of the child. The trial court entered an order on October 2, 2006, awarding DHR temporary custody of the child. On October 3, 2006, the mother and the father answered DHR's petition and requested that the trial *36 court conduct a shelter-care hearing. Following the shelter-care hearing, the trial court entered an order on October 5, 2006, in which it found that placement of the child in the home of the mother and the father was not in the best interest of the child and transferred custody of the child to DHR. Following a November 7, 2006, dependency hearing, the trial court entered an order finding the child to be dependent and transferring custody of the child to DHR. On March 7, 2007, following a review hearing, the trial court entered an order continuing custody of the child with DHR. In the trial court's October 5, 2006; November 7, 2006; and March 7, 2007, orders, the trial court ordered DHR to continue to make reasonable efforts to reunify the child with the mother and the father.
On March 27, 2007, the mother and the father filed a petition for return of custody of the child. Following an ore tenus hearing on July 10, 2007, the trial court entered an order on August 8, 2007, denying the mother and the father's petition to regain custody of the child and reiterating its finding of dependency. In its August 8, 2007, order, the trial court stated that it was relieving DHR of the requirement that it continue its reunification efforts. The mother and the father timely appealed.
The evidence in the record on appeal reveals the following pertinent facts. At the time of the July 10, 2007, hearing, the child was 10 months old and had been in DHR's custody for 9 months. The child tested positive for methadone at the time of her birth. The mother, who was 37 years old at the time of the June 10, 2007, hearing, has an extensive history of drug and alcohol abuse. The mother began using drugs and alcohol around the age of 16. Over the course of her 20-year addiction to drugs, the mother abused crack cocaine, heroin, and prescription pain medications. At the time the child was placed in DHR's custody, the mother was abusing methadone.[1] The father does not have a history of drug or alcohol abuse.
The record indicates that the father has a criminal record. While going through a divorce with his former wife, the father's former wife accused him of rape and domestic violence. The father was subsequently charged with those crimes. On May 13, 2004, the father pleaded guilty to domestic violence. The father also pleaded guilty to assault in the third degree. The record does not reveal the terms of the sentences imposed on the father following his pleas; however, the father completed a 16-week domestic-violence course in late 2004.
In October 2006, after the trial court had removed the child from the mother and the father's custody, DHR developed an individualized service plan ("ISP") for the parties to follow in order to regain custody of the child. The ISP required both the mother and the father to participate in a psychological evaluation; to participate in counseling for past drug abuse and domestic violence; to participate in random drug screens and to remain drug-free and alcohol-free; to exercise supervised visitation with the child; and to provide an explanation for the fractures to the child's skull.
Lisa Patton, a DHR caseworker, testified that the mother and the father had accomplished most of the goals set for them in the ISP and that they had cooperated with DHR. Patton testified that the *37 mother and the father had completed psychological evaluations and had participated in counseling. According to Patton, the mother and the father had remained drug-free and alcohol-free as requested by DHR. Patton testified that she was satisfied with the mother's progress and participation in a drug- and alcohol-rehabilitation program.
Patton expressed concern regarding the father's attitude during a couple of visits the father and the mother made to Patton's office. Patton testified that on one occasion the father "almost crossed the line of a threat" when he stated that "if he doesn't get his baby back somebody will pay." Patton stated that she believed that the father was referring to taking legal action. Patton testified that a similar incident occurred the week before the final hearing when the mother and the father received letters notifying them that child abuse and/or neglect had been "indicated" following an investigation. According to Patton, the mother tried to nudge the father out of the building when the father became upset and said: "`Don't put your hands on me, I won't put my hands on you.'" Patton testified that the father's comment caused her concern.
Patton testified that the only provision in the ISP that the mother and the father had failed to comply with was offering a plausible explanation for the child's skull fractures. While testifying at the July 10, 2007, hearing, Patton alluded to explanations given by the parents at the November 7, 2006, dependency hearing. On direct examination, Patton testified as follows:
"Q. Have the parents provided explanations for the child's injuries?
"A. They have provided explanations.
"Q. And we went through all of those in the dependency hearing?
"A. Correct.
"Q. Have there been any other explanations provided?
"A. Not to my knowledge no, just the same ones."
On cross-examination, Patton further testified:
"Q. You don't have any direct evidence, but you were present at the prior [dependency] hearing and you heard the testimony there and the parents' explanation.
"A. Correct.
"Q. And you are familiar with Dr. Amyia, the doctor at Children's Hospital, her statement?
"A. Correct.
"Q. You don't have any evidence that otherwise explains the unexplained?
"A. Correct."
The record indicates that Dr. Michelle Amyia[2] diagnosed the child's skull fractures. It appears from the record that Dr. Amyia's deposition testimony was admitted into evidence at the November 7, 2006, dependency hearing. Patton testified that she did not perform the investigation of the child's head injury. According to Patton, Jennifer Rios, another DHR employee, had investigated the injury and had testified regarding her investigation of the injury at the earlier dependency hearing. The record does not contain a copy of a transcript of the dependency hearing or any documentary evidence offered at that hearing.
According to Patton, if it were not for the unexplained injury to the child, DHR would return the child to the mother and the father's custody. Patton testified that DHR's policy provides that a child cannot *38 be returned to a home if a serious, unexplained injury occurred in the home. Patton testified that DHR is investigating a relative placement for the child pending a plausible explanation from the mother and the father for the child's head injury.
The mother testified that she had met all the goals required by DHR in the ISP. The mother stated that she had been drug-free since December 4, 2006, and that she planned to complete the rehabilitation program offered by Helping Partners, LLC. The mother testified that she had offered DHR an explanation for the child's skull fractures as required in the ISP. The mother explained that the skull fractures could have been the result of actions taken by a babysitter who had babysat the child on four occasions before the child was diagnosed with the skull fractures. The mother denied any knowledge of the child's falling or sustaining injuries in her or the father's presence. The mother denied that the father had committed acts of domestic violence against her.
The father testified that he and the mother were common-law married and had been living together since 2003. The father testified that he had never committed acts of domestic violence against the mother. The father denied doing anything to hurt the child. The father testified that he believed that the fractures to the child's skull were the result of trauma during birth.
Several witnesses testified at the July 10, 2007, hearing regarding the mother's history of drug and alcohol abuse and her treatment for substance abuse. James Hayes, the owner of Helping Partners, testified that his company offers an 18-month rehabilitation program for drug and alcohol addiction. Hayes testified that the mother began "phase one" of the program, also called "early recovery," on December 19, 2006. According to Hayes, the mother had successfully completed phase one and, at the time of the July 10, 2007, hearing, was participating in "phase two," known as "relapse prevention." Hayes testified that he believed that the mother understood that addiction is a "chronic brain disease." On cross-examination, Hayes acknowledged that he was not a licensed professional counselor or a mental-health professional.
Beth Storey, an educator employed by Helping Partners and the mother's sponsor in that program, testified that the mother had performed well in the program and had faithfully attended meetings. Storey testified that a high risk of relapse exists for two years after an addict stops using drugs. According to Storey, the mother believed that the child sustained the skull fractures during birth.
Carrie Halladay, a licensed professional counselor, provided services to the mother and the father at the request of DHR. Halladay testified that she had performed a domestic-violence assessment on the parents and that both parents had denied that there was any domestic violence in their relationship. Halladay testified that she did not independently investigate any other possible incidents of domestic violence that the father might have been involved in and that she had relied solely on the father's self-reporting his history of domestic violence.
Halladay testified that she had no concerns about the mother's ability to parent the child. According to Halladay, since October 2006 the mother had consistently met with her once a week for counseling. Halladay testified that she conducted the counseling sessions with the mother in the mother's home. Halladay testified that the mother's home appeared to be appropriate for a small child, but Halladay testified that she had not observed the mother with the child in the home. Halladay explained *39 that the mother had made significant progress in counseling. Halladay testified that she had recommended individual counseling for the father, but the father was unable to attend counseling sessions because of his work schedule.
On cross-examination, when asked if there was a reasonable possibility that the mother could relapse, Halladay answered yes. However, Halladay testified that the likelihood that an addict could relapse decreases when the addict attends support meetings, stays in a rehabilitation program, and maintains contact with a sponsor; all of which, according to Halladay, the mother was doing at the time of the hearing. Halladay testified that, generally, it was possible that the mother could not remember actions she had taken while under the influence of drugs.
Martha Jane Hollis, who had supervised the mother and the father's visitation with the child, testified that the mother and the father responded appropriately to the child during visitation. According to Hollis, the child had bonded with the mother and the father. Hollis stated that she had not observed any indication of domestic violence between the mother and the father during visitation.
Debra Braswell, who supervised visitation between the mother, the father, and the child at the time of the July 10, 2007, hearing, testified that she had no concerns about the mother and the father's ability to parent the child. According to Braswell, the mother and the father were "very good" at handling and caring for the child during visitation. Braswell testified that she had never witnessed any indication of domestic violence between the mother and the father.
The mother and the father contend on appeal that the trial court erred when it denied their petition to return custody of the child because, they argue, they complied with the reunification plan as instructed by DHR. The mother and the father essentially challenge the trial court's determination that the child continued to be dependent.
This court is limited in its review of a trial court's judgment when a trial court receives ore tenus evidence. A trial court's judgment resolving disputed ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the factual findings upon which the judgment is based are so unsupported by the evidence as to be plainly and palpably wrong. T.D.P. v. D.D.P., 950 So.2d 311 (Ala.Civ. App.2006). This "`presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.'" L.L.M. v. S.F., 919 So.2d 307, 311 (Ala.Civ.App.2005) (quoting Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App.1999)). The determination of the credibility and veracity of the witnesses is the responsibility of the trial court. Earheart v. Earheart, 842 So.2d 695 (Ala.Civ.App.2002).
We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court's resolution of the facts is plainly and palpably wrong. L.R.M. v. D.M., 962 So.2d 864, 873-74 (Ala.Civ.App.2007) (citing Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala.Civ. App.1994), quoting in turn Young v. Young, 376 So.2d 737, 739 (Ala.Civ.App. 1979)). "`[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.'" Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004) (quoting Ex parte Foley, *40 864 So.2d 1094, 1099 (Ala.2003)). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:
"The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited  factfinding."
Ex parte R.T.S., 771 So.2d 475, 477 (Ala. 2000).
A finding of dependency must be supported by clear and convincing evidence. § 12-15-65(f), Ala.Code 1975; J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ. App.2004). This court has stated that clear and convincing evidence is
"`"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
"`§ 6-11-20[ (b) ](4), Ala.Code 1975.'"
J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1184 (Ala.Civ.App.2007) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002)). Matters of dependency are within the sound discretion of the trial court, and a trial court's ruling in a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. T.D.P. v. D.D.P., supra. The transfer of custody upon a finding of dependency is governed by the child's best interests. F.G.W. v. S.W., 911 So.2d 1, 4 (Ala.Civ.App.2004) (citing Jones v. Webb, 524 So.2d 374, 374 (Ala.Civ.App. 1988)).
At the outset, we note that the mother and the father refer to evidence in support of their argument on appeal that is not contained in the record. Included in that evidence is an 8x10 photograph taken of the child immediately after she was born. The record indicates that before the trial court conducted the July 10, 2007, hearing, the parties stipulated that the testimony and documentary evidence from the November 7, 2006, dependency hearing be "incorporated" with the evidence presented at the July 10, 2007, hearing so that the trial court could consider all the evidence before rendering its judgment. The trial court agreed to the stipulation and noted that it would "review the notes and also the transcript on the prior adjudication of dependency." The record on appeal does not contain a copy of the transcript of the dependency hearing or any documentary evidence admitted at that hearing.
It is well settled that "an appellate court is limited to a review of the record, and the record cannot be changed, altered, or varied on appeal by statements in briefs of counsel." Quick v. Burton, 960 So.2d 678, 680-81 (Ala.Civ.App.2006)(citing Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000), and Gotlieb v. Collat, 567 So.2d 1302, 1304 (Ala.1990)). This court cannot presume error or the existence of facts to which the record is silent. Id. Also, this court must conclusively presume that the evidence not contained in the record on appeal supports the trial court's judgment. Sartin v. Sartin, 678 So.2d 1181, 1183 (Ala.Civ.App.1996).
The burden is on the mother and the father, as the appellants, to ensure that the record on appeal contains sufficient evidence to warrant a reversal. Goree *41 v. Shirley, 765 So.2d 661, 662 (Ala.Civ. App.2000). The mother and the father have not attempted to invoke Rule 10(f), Ala. R.App. P., which provides for the correction or modification of the record on appeal. Further, it is beyond this court's authority to take judicial notice of another court's records. See Warren v. Wester, 827 So.2d 116, 119 n. 3 (Ala.Civ.App.2002)(recognizing that this court is not generally permitted to take judicial notice of the records of another judicial body); Worthington v. Amerson, 741 So.2d 437, 438 n. 2 (Ala.Civ.App.1999) (stating that "[g]enerally, a court may not take judicial notice of the records of another court"); and Lyle v. Eddy, 481 So.2d 395, 397 (Ala.Civ.App.1985) (recognizing that "there is no authority allowing a judge to judicially notice the record of proceedings from a prior court").
The trial court's August 8, 2007, order denying the mother and the father's petition for return of custody does not contain specific findings of fact. "`It is... well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.'" Ex parte Fann, 810 So.2d 631, 633 (Ala.2001)(quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996)).
Section 12-15-1(10), Ala.Code 1975, defines a dependent child, in pertinent part, as a child:
"f. Who is in a condition or surroundings or is under [such] improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
". . . .
"j. Who is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
". . . .
"m. Who for any other cause is in need of the care and protection of the state; and
"n. In any of the foregoing, is in need of care or supervision."
In addition to the evidence from the November 7, 2006, dependency hearing, the trial court considered evidence indicating that the child had suffered unexplained skull fractures while in the mother and the father's custody. Although the mother and the father complied with most of the requirements included in the ISP prepared by DHR, the evidence supports a finding that the mother and the father failed to offer a plausible explanation of how the child sustained the fractures to her skull. References made during the July 10, 2007, hearing to the deposition testimony of Dr. Amyia that was introduced at the November 7, 2006, dependency hearing indicate that Dr. Amyia's explanation of the child's injuries conflicted with the explanations given to DHR by the mother and the father. The trial court could have concluded that, based on the severity of the child's injury and the conflicting explanations of how the child was injured, the child remained dependent. Because we do not have a copy of the transcript of the November 7, 2006, dependency hearing or Dr. Amyia's deposition testimony, we must assume that evidence contained in the transcript and Dr. Amyia's deposition testimony support the trial court's decision to continue custody of the child with DHR. See Leeth v. Jim Walter Homes, Inc., 789 So.2d 243, 247 (Ala.Civ.App.2000) *42 ("`[W]hen a trial court's order is based on evidence that is not before the appellate court, we conclusively presume that the court's judgment is supported by the evidence.'" (quoting Newman v. State, 623 So.2d 1171, 1172 (Ala.Civ.App.1993))).
In his dissent, Judge Moore concludes that the evidence elicited at the November 7, 2006, dependency hearing was irrelevant to our review of the trial court's judgment in this case because that evidence "could not have possibly been directed toward future events" and, therefore, "could not possibly supply the missing clear and convincing evidence DHR needed to prove that the child remained dependent on July 10, 2007." 992 So.2d at 54. Although we do not have a copy of the transcript of the November 7, 2006, dependency hearing, or of Dr. Amyia's deposition testimony, it is undisputed that the trial court considered at that hearing evidence regarding skull fractures that the child had sustained while in the mother and the father's custody. The evidence presented at the November 7, 2006, hearing remained relevant to the issue addressed at the July 10, 2007, hearing because, at the time of that hearing, the child's injuries remained unexplained and, therefore, the basis for the initial finding of dependency continued to exist.
Judge Moore concludes in his dissent that the dependency statute does not state that a child is dependent and remains dependent if that child has unexplained injuries. Although Judge Moore is correct that the dependency statute does not specifically provide for that particular circumstance, § 12-15-1(10)j., Ala.Code 1975, of the dependency statute defines a dependent child as one "[w]ho is physically ... abused by the child's parents ... or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents...." The child in this case sustained injuries to her skull indicating physical abuse. The trial court could have concluded that the threat of physical injury to the child continued to exist, and, therefore, that the child remained dependent.
Judge Moore, in his dissent, effectively reweighs the evidence presented to the trial court and draws conclusions from the evidence, a function that is best left to the trial court, as the fact-finder. See Ex parte R.T.S., supra. One of the several conclusions made by Judge Moore in his dissent is that "DHR basically admitted that the child was no longer in need of DHR's protection, care, or supervision." 992 So.2d at 55. Our review of the record does not support such a conclusion. Patton, the only DHR employee called to testify at the final hearing, did not testify that the child was no longer in need of DHR's protection, care, or supervision. Patton testified at length regarding the child's unexplained injuries and expressed her concern that the cause of the injuries remained unknown. It is not the function of an appellate court to advocate a position on behalf of an appellant. Schiesz v. Schiesz, 941 So.2d 279 (Ala.Civ.App.2006).
We commend the mother and the father on their efforts to regain custody of the child. It appears that they are making the necessary efforts to eventually regain custody of the child. However, we are limited in our review on appeal to the evidence that is included in the record, and we cannot presume error based on references to evidence not contained in the record. Accordingly, the judgment of the trial court is due to be affirmed.
AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
BRYAN and MOORE, JJ., dissent, with writings.
*43 BRYAN, Judge, dissenting.
I am deeply troubled by the factual circumstances involved in this action. I agree with Judge Moore insofar as he concludes that the Cleburne County Department of Human Resources failed to present clear and convincing evidence indicating that the child remained dependent at the time of the July 10, 2007, hearing.
MOORE, Judge, dissenting.
Because I conclude that the evidence does not support the juvenile court's judgment, I respectfully dissent.

Additional Facts
Although the majority opinion summarizes the evidence fairly well, I would supplement that recitation with the following additional salient facts: S.M. ("the father") explained his criminal convictions at trial. The father testified that he had discovered that his former wife of 28 years had not been paying the couple's bills and that they had a serious confrontation about it that included some pushing and shoving. Based on this incident, the father's former wife, her mother, the couple's son, and the couple's daughter had all obtained protection-from-abuse orders against the father. The former wife had also claimed that the father had assaulted and raped her. The father pleaded guilty to domestic violence on May 13, 2004, and to assault in the third degree on a later date. The father completed a 16-week domestic-violence course in late 2004. The father had not had any other criminal charges filed against him. It is undisputed that the father, who was 50 years old at the time of the last hearing in this matter, also had not had any other experience with domestic violence. As the majority opinion states, the record contains no evidence of "any other possible incidents of domestic violence that the father might have been involved in." 992 So.2d at 38.
At the insistence of the Cleburne County Department of Human Resources ("DHR"), the parents have theorized that the child may have been injured during her difficult childbirth, which had required the use of forceps to remove the child from the birth canal; that the babysitter may have injured the child; or that the child may have hurt her head on her car seat. The father also provided all the information he could to DHR and law enforcement. However, the parents have always maintained to DHR and to others that they simply do not know how the child was injured, and the parents have always denied any accidental injuries befalling the child while in their care. A psychologist who evaluated the parents on January 3, 2007, stated in his report:
"The issues relative to child abuse cannot be addressed in this assessment, but I will say that both [parents] appear to be credible informants throughout the interview and assessment, and they did strike me as being very, very concerned and upset about the whole situation and very much hopeful about having this little girl returned to their care."
Although it appears that DHR issued an "indicated" child abuse and neglect report against the parents in early July 2007, the parents planned to appeal that report, and no arrests had been made regarding the child's injuries as of the July 10, 2007, hearing.
Some evidence indicates that the parents took the child to the doctor in September 2006 specifically to receive answers regarding an unusual red spot they had noticed on the child's head, not simply as part of the child's regular checkup. The evidence also indicates that the pediatrician ordered X-rays on September 28, 2006, and that J.B. ("the mother") took the *44 child back to the doctor on September 29, 2006, either to undergo the X-rays or to receive the results of the X-rays.
Since the adoption of the initial individualized service Plan ("ISP") on October 5, 2006, DHR has consistently noted the family's strengths as being the parents' obvious love for the child as evidenced by the way they cared for the child during visitations, their reliable transportation, the father's steady employment, and their stable home. DHR has also always had as its permanency goal a return of the child to the parents or placement of the child with relatives. The mother does not work and can devote 100% of her time to raising the child. The father testified that the child's first word was "Daddy" and that he loved the child.
Although Carrie Halladay, the mother's counselor, testified at trial that she wanted to pursue counseling with the father regarding his alleged anger-management problem, both the mother and the father testified that Halladay had told the father he did not need counseling. Lisa Patton, a DHR caseworker, also testified that Halladay had told her the father did not need counseling. Patton transcribed that statement in an ISP meeting that occurred on March 27, 2007. Halladay also testified at trial that she was not concerned about domestic violence in the relationship between the parents.
The mother testified that she had quit using methadone on November 16, 2006, but that she had continued taking prescription medications until December 4, 2006, because of pain she experienced as the result of an automobile accident in which she had been involved. The mother testified that she had quit using methadone "cold turkey" because "my baby was worth it." The mother experienced significant withdrawal symptoms and went through several weeks of physical illness. The mother tested positive for drugs on December 12, 2006, but she testified that that test had detected her prescription pain medication. The mother never tested positive for drugs again despite undergoing as many as eight additional random drug screens. The mother excelled in her drug-rehabilitation program, graduating to the second level well before scheduled. Halladay, who is trained to observe signs of substance abuse, testified that the mother had quit using drugs. The mother is committed to her rehabilitation aftercare program, frequently talks with her sponsor over the telephone, and intends to volunteer to help other substance abusers with their recoveries. Halladay testified that an addict can reduce the risk of relapse by attending meetings with other recovering addicts, by affiliating with nonusers, and by following the 12-step program, all of which the mother was doing.
The psychological evaluation that took place on January 3, 2007, revealed that the most significant issue for the mother was her long history of drug dependence, which was then only in early remission. The psychologist had also found some moderate signs of features of dependent-personality disorder. The psychologist recommended that the mother continue her counseling with Halladay and that DHR continue monitoring her drug use. As for the father, the psychologist found no indication of any type of mental illness or other psychiatric limitations. Patton testified that the psychological evaluations did not indicate a need for counseling for either parent beyond the counseling Halladay was providing the mother. Halladay testified that her counseling, which the mother never missed, was directed towards the underlying issues that had fueled the mother's substance abuse, such as self-esteem problems, depression, impulse-control problems, and social phobias. Halladay *45 testified that she was trying to help the mother become more independent. Halladay testified that, by the time of the trial, the mother had improved in all areas, showing self-confidence, a happier disposition, and greater sociability. Martha Jane Hollis, who had supervised the parents' visitation with the child, echoed this testimony when she testified that she had noticed that the mother seemed more confident, healthier, and happier during the last visits. At trial, Halladay testified that she believed the mother needed ongoing counseling and that the mother was receptive to that.
Hollis testified that, as an employee of Family Values, LLC, with a college degree in early childhood development, she had been trained in how to identify and redirect inappropriate parenting behavior. Hollis testified that she had not seen any problems with the parents' home. Hollis also testified that she had not observed any problems with the parenting skills of the mother and the father. She testified that they were very gentle with the child and that they had responded appropriately to the child's needs. Hollis testified that she had never observed any frustration or lack of parenting knowledge on the part of the parents, that she had never had to redirect the parents or even make suggestions to them, and that the child had never been in danger during any of the visits. Hollis also testified that the parents had always seemed comfortable with the child and had quickly learned what the child's cries meant. The child's eyes would follow her mother, and she would become aggravated if the mother left the room. The child was developing normally, and the parents played with the child with age-appropriate toys. The parents had made a nursery for the child in their home that was decorated nicely and very well supplied. The parents had had a lot of clothes for the child that they had eventually given to the foster parents for the child.
Debra Braswell, another Family Values employee, testified that she had taken over supervising the visitations from Hollis in March 2007. The family visited together in the family home on Mondays and Wednesdays for three and a half hours each day. Occasionally, the visits would be extended for up to seven hours. Both parents had been cooperative with Braswell. They had attended to the child's needs. The father had bought a tub for the child to soak in when she was experiencing diaper rash. Both parents bathe and feed the child. The nursery is nice and neat. The parents had provided toys for the child, including a dancing frog that would calm the child when nothing else worked. The parents comforted the child when the child became fussy. Braswell described them as "very good parents." She had never witnessed any controlling or intimidating behavior between the parents or detected any signs of domestic violence. At one point, the child was on a heart monitor and a breathing machine, but by the time of trial she was no longer using those devices. The child does not require extra precautions because of her head injuries. The child has developed normally, crawling, waving goodbye to her parents, reaching for and holding her bottle, and acting like a normal 10-month-old child. Braswell testified that she saw no reason why the child should continue to be supervised while visiting with the parents.
Patton testified on direct examination as follows:
"Q: Do you have any complaints or concerns that there's domestic violence in the home?
"A: Not actually. There was some incidents of some verbal that I have concerns about.
"Q: And what were those?

*46 "A: [The father] has been in the office a couple of times and almost crossed the line of a threat. He has stated in the past if he doesn't get his baby back somebody will pay. I think he was talking more legally.
". . . .
"Q: Did it cause you concern for your safety?
"A: No.
"Q: Have you ever had other parents say other things like that before?
"A: Yeah."
Patton also testified:
"Q: Overall how has the attitude and effort been of [the father]?
"A: He's done what we've asked him to do. Actually in visitations, especially when I was supervising them at the DHR office, he consistently talked about how he was done wrong and he was going to make everything right. And I do, like I said, think he meant legally, through a lawsuit or something to that effect. Otherwise, he has been completely cooperative."
Regarding the mother, Patton testified on direct examination:
"Q: And the same question for [the mother], how has her attitude and effort been overall?
"A: Great. Done everything we've asked her to do."
Patton had received no complaints or heard any concerns regarding the parents from the psychologist, the mother's counselors, or the visitation supervisors. Patton had observed the parents' visits with the child on a weekly basis since September 2006. Patton believed the family had bonded, and she testified that she had never had to redirect the parents' parenting behavior.
Patton testified that the parents had also provided explanations for the child's head injuries. Those explanations were provided at the dependency hearing in November 2006. The parents had not offered any further explanations since. Patton further testified on direct examination as follows:
"Q: Is there any information that you have that makes you think that either one of these parents intentionally injured this child?
"A: I don't know.
"Q: There's just no evidence of it?
"A: Right. There's no evidence."
Patton also later testified that she had no evidence indicating that either parent had committed any abusive acts against the child. Patton further testified:
"Q: But for you finding some explanation as to how this injury occurred, the parents have done every single thing [DHR] has asked them, right?
"A: Yes.
"Q: And but for that, would you be returning the child to them?
"A: If it wasn't for the unexplained injury, yes."
Patton further testified that, until the parents provide an answer for the unexplained injury, DHR planned to place the child with a relative. Patton maintained that the child would be at risk if the parents were allowed to visit with her unsupervised because "we don't know whether it was them or not." Patton testified that it is DHR's policy not to allow a child to return to the parental home when the child has suffered a serious unexplained injury in the home. That fact alone is what has prevented any further movement toward reunification of the family.

*47 The Issue

The majority opinion states that the parents "essentially challenge the trial court's determination that the child continued to be dependent." 992 So.2d at 39. The parents do challenge that finding, but they also challenge the implicit findings that reasonable efforts at reunification had failed and that it was not in the best interests of the child to return her to their custody.

The Burden of Proof
In the ordinary civil custody case not involving allegations of dependency, in order for a parent to recover custody of a child from a nonparent, it is not sufficient for the parent to show merely that his or her circumstances or conditions have improved since the entry of the last custody order to the point that he or she has become a fit person to raise the child. Ex parte McLendon, 455 So.2d 863, 866 (Ala. 1984). Rather, when a nonparent has gained custody of a child via a court order, "`the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'" McLendon, 455 So.2d at 865 (quoting Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947), quoting in turn Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687, 40 L.R.A. 623 (1898)). As the McLendon court explained:
"`[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'"
455 So.2d at 865-66 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App. 1976)). See also Ex parte Cleghorn, [Ms. 1061014, Feb. 8, 2008] ___ So.2d ___ (Ala. 2008) (holding that noncustodial parent need not prove an obvious and overwhelming necessity for change in order to satisfy the McLendon standard).
Although this court has applied the McLendon standard to dependency cases, see J.F. v. A.G., 607 So.2d 234 (Ala.Civ. App.1991), Sexton v. Lambert, 611 So.2d 385 (Ala.Civ.App.1992), P.Y. v. State Dep't of Human Res., 634 So.2d 1021 (Ala.Civ. App.1994), C.C. v. A.G., 667 So.2d 128 (Ala. Civ.App.1995), In re F.W., 681 So.2d 208 (Ala.Civ.App.1996), B.J.N. v. P.D., 742 So.2d 1270 (Ala.Civ.App.1999), A.H. v. R.M., 793 So.2d 799 (Ala.Civ.App.2001), S.B.L. v. E.S., 865 So.2d 1214 (Ala.Civ. App.2003), and F.G.W. v. S.W., 911 So.2d 1, n. 2 (Ala.Civ.App.2004), the court eventually recognized that the McLendon standard should not be applied to dependency cases in which custody has been only temporarily transferred to a nonparent. See S.P. v. E.T., 957 So.2d 1127 (Ala.Civ.App. 2005). Unlike in the ordinary civil custody case, in a dependency case the parent is divested of the custody of the child only based upon clear and convincing evidence that the child is dependent. See Ala.Code 1975, § 12-15-65(f). The juvenile court may then transfer custody of the child to a nonparent, such as DHR or a qualified relative. See Ala.Code 1975, § 12-15-71(a)(3).
However, the legislature has established a goal for the juvenile courts to reunite a *48 child with his or her parents as quickly and as safely as possible when the child has been removed from the custody of his or her parents. Ala.Code 1975, § 12-15-1.1(3). Pursuant to that goal, if a juvenile court enters an order continuing the placement of a child outside the home, the order must contain the following specific findings, "if warranted by the evidence":
"(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
"(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home, or that an emergency situation exists which requires the immediate temporary removal of the child from his or her home and that it is reasonable not to make efforts to prevent removal of the child from his or her home due to the emergency situation.
"(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed."
Ala.Code 1975, § 12-15-65(g). Alabama Code 1975, § 12-15-65(m), defines "reasonable efforts" as, among other things, "efforts ... to make it possible for a child to return safely to the child's home." Reasonable efforts include efforts to rehabilitate the parent so that the parent can "again exercise familial rights and responsibilities toward the child in question." Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370, 1374 (Ala.Civ.App. 1979); see also D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 89 n. 10 (Ala. Civ.App.2003) (plurality opinion).
Therefore, when a juvenile court places a child in the custody of a nonparent during the rehabilitation period, the transfer of custody is not intended to be so long-lasting that the child is expected to lay down roots and stabilize in the custody of the nonparent; rather, it is designed to be a temporary protective measure to safeguard the child until either the parent can safely resume custody or, reunification efforts having failed, some other permanent disposition of the child may be made. See D.M.P., supra. Thus, none of the theories underpinning the McLendon standard apply to dependency cases, at least until the "permanent" disposition of the child. S.P. v. E.T., 957 So.2d at 1131 ("See Ex parte J.P., 641 So.2d [276,] 278 [(Ala.1994)] (`by its very nature, custody is always temporary and never permanent' because it is always subject to change based upon the appropriate petition and evidence).").
Although caselaw has clearly rejected the application of the McLendon standard to cases such as this one, caselaw has not clearly indicated the standard that should be applied. In S.P. v. E.T., the court indicated that a parent must show that his or her resumption of custody is in the best interests of the child. 957 So.2d at 1131-32; see also L.L.M. v. S.F., 919 So.2d 307, 311 (Ala.Civ.App.2005); W.T.M. v. S.P., 802 So.2d 1091 (Ala.Civ.App.2001); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997)(plurality opinion); Calhoun County Dep't of Human Res. v. S.P., 758 So.2d 1107 (Ala.Civ.App.1999); W.T. v. State Dep't of Human Res., 707 So.2d 647 (Ala.Civ.App.1997) (plurality opinion); and O.L.D. v. J.C., 769 So.2d 299 (Ala.Civ.App. 1999). In making that determination, the juvenile court should consider factors such as the "`characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and each parent.'" Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994) (quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981)). Other factors the juvenile *49 court may consider in making a custody determination include "the sex and age of the child, as well as each parent's ability to provide for the child's educational, emotional, material, moral, and social needs." Tims v. Tims, 519 So.2d 558, 559 (Ala.Civ.App.1987).
However, S.P. v. E.T. cited Ala.Code 1975, § 12-15-71(a), to support the position that "our legislature has indicated that the appropriate standard to be applied in an ongoing dependency proceeding is the best-interest standard." 957 So.2d at 1131-32. That subsection applies only in cases in which the child "is found to be dependent." Ala.Code 1975, § 12-15-71(a). As Judge Murdock pointed out in his special writing in K.B. v. Cleburne County Department of Human Resources, 897 So.2d 379 (Ala.Civ.App.2004),
"in order to make a disposition of a child in the context of a dependency proceeding, the child must in fact be dependent at the time of that disposition. See § 12-15-65(d) and (f), Ala.Code 1975; § 12-15-71(a), Ala.Code 1975; and Phillips v. Alabama Dep't of Pensions & Sec., 394 So.2d 51, 52-53 (Ala.Civ.App. 1981) ('The court, in finding the allegations of a petition in a juvenile proceeding to be true, necessarily finds the child to be either "dependent," "delinquent" or "in need of supervision." See, §§ 12-15-52, 65, Code of Alabama (1975).'). In other words, a finding of dependency is inherent to any dispositional order under § 12-15-71(a). Whether a child `had been' found dependent at some earlier time ... would have been immaterial if the child was no longer dependent at the time of the dispositional order. If the child no longer continued to be dependent at the time of the dispositional order, the trial court would have no authority to make any disposition of the child under our dependency statutes.
"While it is true that, in making the dispositional decision regarding a dependent child, the court is governed by a `best interest' standard, see § 12-15-71(a), the test for dependency is not the child's best interest. Instead, a finding of dependency must be based upon the factors listed in § 12-15-1(10), Ala.Code 1975 (defining a `dependent child'). Those factors do in fact speak to the issue of parental unfitness, or in some cases neglect or abandonment, or other comparable problems giving rise to a compelling state interest in interfering with the natural parent/child relationship."
897 So.2d at 389-90 (Murdock, J., concurring in the result). This court has recently recognized that a juvenile court must make a finding of dependency at the time of any disposition of the child. See V.W. v. G.W., 990 So.2d 414 (Ala.Civ.App.2008).
Apparently, therefore, when a parent petitions the juvenile court to regain custody of the child, the juvenile court is confronted with several separate, but interrelated, questions: (1) whether the child remains dependent, see J.P. v. S.S., 989 So.2d 591 (Ala.Civ.App.2008), (2) whether reasonable efforts at reunification, if required, have failed or succeeded, see Ala.Code 1975, § 12-15-65(f), and (3) whether it is in the best interests of the child to be returned to the custody of the parents. See Ala.Code 1975, § 12-15-71(a).
Also, although the law appears settled that the parent has the burden of proving that a return of custody would be in the best interests of the child, see S.P. v. E.T., supra, the law is not clear on which party bears the burden of proving or disproving continuing dependency and which party bears the burden of establishing the effectiveness or ineffectiveness of reasonable reunification efforts. Our supreme court *50 has declared that DHR has the burden of proving dependency by clear and convincing evidence. See Ex parte Floyd, 550 So.2d 982 (Ala.1989); and Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004). This burden properly rests with DHR because of the fundamental constitutional right to family integrity. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A state may deprive a parent of custody of a child only when a compelling governmental interest, such as the protection of the child, exists. See L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App. 2002); and R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001) (plurality opinion). Therefore, the burden should rest with the state, as the party claiming the right to interfere with the integrity of the family, to prove the existence of the compelling circumstances warranting its intrusion. See Santosky, supra. These same principles suggest that when the state has deprived a parent of custody of a child on the basis of the child's dependency, the burden rests on the state to prove by clear and convincing evidence that the child remains dependent. Having proven that circumstances existed at one time that rendered the child dependent, the state is not relieved of its burden of proving that the child remains dependent at a later time or under different circumstances.
Other states explicitly or impliedly hold that their respective child-protection agencies bear the burden of proving by clear and convincing evidence that reasonable efforts at rehabilitation, if required, have failed. See, e.g., In re D.B., 339 Mont. 240, 246, 168 P.3d 691, 696 (2007) (citing § 41-3-609(1)(f), Mont.Code Ann.); Division of Family Service v. N.X., 802 A.2d 325 (Del. Fam.Ct.2002); In re Michael G., 63 Cal. App.4th 700, 74 Cal.Rptr.2d 642 (1998); In re Savanna M., 55 Conn.App. 807, 740 A.2d 484 (1999) (citing Conn. Gen.Stat. § 17a-112(c)(1)). Consistent with the foregoing analysis regarding continuing dependency, it would seem that in order for a juvenile court to deprive parents of the custody of a dependent child, the burden would be on DHR, as the representative state agency, to prove by clear and convincing evidence that reasonable efforts at reunification, if required, have failed or, in an ongoing dependency case, at the very least, that such efforts had not yet succeeded.
To summarize, in this case, once the parents petitioned the juvenile court to regain custody of the child, the parents bore the burden of proving to the reasonable satisfaction of the juvenile court that it was in the best interests of the child to reunite with the family. DHR had the burden of proving by clear and convincing evidence that the child remained dependent and that reasonable efforts at reunification had not yet succeeded. The juvenile court could continue to completely deprive the parents of the custody of the child only if the appropriate quantum of evidence established all three conditions: that the child remained dependent, that reasonable efforts at reunification had not succeeded, and that it was not in the best interests of the child to return to the parents' custody.

Standard of Review
Generally speaking, an appellate court reviews a juvenile court's judgment disposing of the custody of a child after an ore tenus dependency proceeding with a presumption that the juvenile court correctly assessed the evidence and decided the appropriate custodial arrangement, and that judgment will be set aside only upon a showing that the juvenile court exceeded its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. T.D.P. v. D.D.P., supra. However, the general standard *51 of review is tempered by two considerations pertinent to this case.
First, the ore tenus presumption does not apply to undisputed evidence. As explained in Adderhold v. Adderhold, 426 So.2d 457 (Ala.Civ.App.1983),
"the ore tenus presumption of correctness applies only to resolution of conflicts in evidentiary facts, and has no application where facts are undisputed, and it is solely for the appellate court to determine whether the trial court misapplied the law to undisputed facts. Home Indem. Co. v. Reed Equipment Co., Inc., 381 So.2d 45 (Ala.1980)."
426 So.2d at 460.
Second, as our supreme court recently stated:
"[W]hile we must presume under the ore tenus rule that the trial court's factual findings are correct, that rule does not relieve this Court of its responsibility to ensure that [the] facts clearly and convincingly warrant [a judgment depriving parents of the custody of their child].
"`"The appellate courts do not sit in judgment of the facts, and [they] review the factfinder's determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law."' Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App.2003) (quoting Curtis White Constr. Co. v. Butts & Billingsley Constr. Co., 473 So.2d 1040, 1041 (Ala.1985)) (emphasis omitted). Justice Smith's dissent suggests that we are in the case before us `"reweigh[ing] the evidence."' 971 So.2d at 20. We are not; we are required, however, to determine whether clear and convincing evidence supports the trial court's conclusion...."
Ex parte T.V., 971 So.2d 1, 9 (Ala.2007). Therefore, when reviewing a finding of dependency, it is the duty of an appellate court to "determine whether clear and convincing evidence supports the trial court's conclusion" that the child is dependent. T.V., 971 So.2d at 9. Because a finding that reasonable efforts at reunification had failed must also be supported by clear and convincing evidence, the same standard of review applies to that determination. "Clear and convincing evidence" is "`"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" T.V., 971 So.2d at 9 (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), citing in turn Ala.Code 1975, § 6-11-20(b)(4)).
In using the appropriate standard of review, I conclude that the juvenile court's finding of dependency and its finding that reunification efforts had failed are not supported by clear and convincing evidence. I also conclude that the evidence does not support the juvenile court's finding that it was not in the best interests of the child to be returned to the custody of the parents. To reach this conclusion, I do not "reweigh" the evidence, as the majority claims, 992 So.2d at 42, because I find the evidence to be basically undisputed on most major points. I also do not "advocate a position on behalf of an appellant," 992 So.2d at 42, because I find that the undisputed evidence supports their position.

Analysis
The Alabama Juvenile Justice Act, Ala. Code 1975, § 12-15-1 et seq., defines "dependent child" as, among other things,
"[a] child:
". . . .
"d. Whose home, by reason of neglect, cruelty, or depravity on the part of *52 the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
". . . .
"f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
". . . .
"j. Who is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
"k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
". . . .
"m. Who for any other cause is in need of the care and protection of the state; and
"n. In any of the foregoing, is in need of care or supervision."
Ala.Code 1975, § 12-15-1(10). Although the dependency statute lists various factors that may contribute to a child's dependency, § 12-15-1(10)n. requires in all cases that the child be "in need of care or supervision." Accordingly, this court has concluded that a child's dependency ends when the parents can resume proper care and supervision of the child without oversight or assistance from others. See S.P. v. E.T., 957 So.2d at 1131 ("Under ideal circumstances, such final dispositional orders coincide with the end of the child's dependency, i.e., the child has a proper custodian `and' is no longer `in need of care or supervision' by persons other than the custodian. See Ala.Code 1975, § 12-15-1(10)n.").
In this case, the evidence is undisputed that at the time of the July 10, 2007, hearing the parents could properly care for and supervise the child independently. The witnesses who spent over 200 hours scrutinizing the parents' interaction with the child during supervised visitations basically testified that the parents had never endangered the child, never had to be redirected in the proper care of the child, had always adequately responded to the child's needs, had demonstrated love and tenderness towards the child at all times, and no longer needed to be supervised. It is obvious from Patton's testimony that DHR did not consider the parents to be unable to properly care for and supervise the child.
As Patton testified, the only reason DHR did not recommend returning the child to the parents related to the child's unexplained injuries. Under § 12-15-1(10)j., a child is dependent if the parents have physically abused the child or neglected the child and the child is in need of care and supervision. However, Patton testified that, as of July 10, 2007, DHR had no evidence indicating that the parents had physically abused or neglected the child. Patton admitted that DHR simply did not know whether the parents had anything to do with the child's injuries. DHR did not adduce clear and convincing evidence at the July 10, 2007, hearing to prove that the parents had abused or neglected the child. Rather than hold DHR to its burden of proof, however, the juvenile court evidently adopted DHR's policy that requires parents of a child with unexplained injuries to prove that those injuries had not resulted from parental abuse or neglect. However, in a dependency proceeding, the juvenile court may not excuse a lack of positive evidence by improperly *53 shifting the burden of proof onto the parents. See generally Ex parte Floyd, 550 So.2d 982 (Ala.1989) (implicitly recognizing that juvenile court may not improperly shift burden of proof onto parents, but finding no improper shifting).
More importantly, in shifting the burden of proof, the juvenile court placed the parents in an untenable situation. In order to regain custody of the child, the parents had to prove that they did not abuse or neglect the child by explaining the source of the child's injuries to the satisfaction of the juvenile court. If the parents honestly do not know how the child was injured, as the psychologist's report appears to indicate, the parents would have to commit perjury in order to have any opportunity of recovering the child. If the only explanation that would satisfy the juvenile court is an admission of abuse or neglect by the parents, upon receiving that explanation, the juvenile court would be justified in withholding the child from the parents. Under the circumstances of this case, by giving the parents this "Hobson's choice," the juvenile court acted outside the bounds of its discretion. See In re Amanda W., 124 Ohio App.3d 136, 142, 705 N.E.2d 724, 728 (1997) (admonishing local children's services agency for forcing parents accused of sexual abuse to admit the abuse or lose custody of the child, thus "creat[ing] a `Hobson's Choice' wherein any choice made by the parent results in adverse consequences").
The evidence also does not sustain the juvenile court's implicit finding that reasonable efforts leading toward rehabilitation and reunification had failed. In similar cases, other states have determined that if an explanation of a child's injuries, and an acknowledgment of culpability by a parent, is an essential first step to the rehabilitation of the parent, then a juvenile court may properly withhold custody of a child to a recalcitrant parent who otherwise does not rehabilitate. See, e.g., In re C.H., 652 N.W.2d 144 (Iowa 2002); In re P.M.C., 376 Ill.App.3d 867, 876 N.E.2d 1061, 315 Ill.Dec. 471 (2007); In re J.G.W., 433 N.W.2d 885 (Minn.1989); State v. P.Z., 152 N.J. 86, 703 A.2d 901 (1997); In re Gladys H., 235 A.D.2d 841, 653 N.Y.S.2d 392 (1997); In re Roman, 94 Misc.2d 796, 405 N.Y.S.2d 899 (N.Y. Family Ct.1978); and In re J.A., 166 Vt. 625, 699 A.2d 30 (1997). However, in this case, DHR presented no evidence indicating that the parents needed to explain the child's injuries or accept responsibility for those injuries as a precursor to effective therapy and rehabilitation. In fact, the record discloses that the only therapy recommended by the psychologist or Halladay, the counselor, was directed towards the mother's substance-abuse problem and the personality issues underlying that problem. Neither Halladay nor the psychologist opined that the parents could resume their familial responsibilities toward the child only if they first recognized their role in the child's injuries. In the absence of such evidence, DHR had no factual basis for insisting that the parents explain the child's injuries.[3]
Moreover, the evidence is undisputed that, even without the explanation of the child's injuries, the parents have effectively rehabilitated to the point that they can safely exercise their familial responsibilities to and for the child. Halladay, who had been evaluating the mother for over nine months, testified that the mother had quit using drugs and that, in her professional opinion, the mother could properly *54 parent the child. Two addiction educators, James Hayes and Beth Storey, testified that the mother had committed to a lifestyle without drugs. The psychologist who examined the father found no signs of mental or emotional disturbance, and the great weight of the evidence indicates that Halladay determined that the father did not need counseling to overcome any alleged anger-management problem. Even Patton testified that DHR was satisfied with the mother's progress in drug rehabilitation and that DHR did not have a concern of any ongoing domestic violence in the home.
The majority opinion posits that this court must assume that the evidence missing from the record supports the judgment of the juvenile court. Although ordinarily this court must assume that evidence omitted from the record supports the trial court's judgment, I have been unable to uncover a single case applying that general principle to a situation analogous to this one. In this case, the juvenile court held at least two separate hearings. The November 7, 2006, adjudicatory hearing concerned whether the child was dependent at that time. On the other hand, the July 10, 2007, hearing concerned the questions whether the child remained dependent and whether reasonable efforts leading towards rehabilitation of the parents and reunification with the child had succeeded. At the latter hearing, the juvenile court considered all the events occurring since the November 7, 2006, dependency hearing and had to decide whether based on the intervening circumstances the child should be returned to the parents at that time. Because the evidence presented at the November 7, 2006, hearing could not have possibly been directed toward future events, the record from the earlier hearing could not possibly supply the missing clear and convincing evidence DHR needed to prove that the child remained dependent on July 10, 2007, and that reasonable reunification efforts had not succeeded. Therefore, I do not believe this court can indulge the presumption that the juvenile court properly relied on evidence from the November 7, 2006, hearing to support its August 8, 2007, judgment.
The majority opinion nevertheless concludes that the evidence from the November 7, 2006, hearing supports a finding that the child remained dependent on July 10, 2007. The majority first states that "it is undisputed that the trial court considered at that hearing evidence regarding skull fractures that the child had sustained while in the mother and the father's custody." 992 So.2d at 42. The majority next states that that evidence remained relevant "because at the time of [the July 10, 2007,] hearing, the child's injuries remained unexplained and, therefore, the basis for the initial finding of dependency continued to exist." 992 So.2d at 42. I agree that the evidence from the November 7, 2006, hearing established that the circumstances of the child's injuries were unexplained and that those circumstances "remained unexplained" at the time of the July 10, 2007, hearing. My agreement with that statement forces me to disagree with the foregoing statement that the child received her injuries "while in the mother and father's custody," at least to the extent that statement refers to the parents' physical custody. If the record is clear on any point, it is that DHR did not prove when or how the child was injured.
Apparently, the majority takes the position that a child with unexplained injuries is dependent and remains dependent so long as those injuries are unexplained. I cannot subscribe to such a rule. The dependency statute certainly does not state that a child is dependent under such circumstances. The majority has also not cited any opinion that has adopted such a *55 rule. On the other hand, the dependency statute and caselaw is clear that a child is no longer dependent when the child's parent can properly care for and supervise the child. Even assuming that the parents may have had some responsibility for the child's injuries, the record is absolutely devoid of any evidence that they were unable to properly care for and supervise the child on July 10, 2007. Whether right or wrong, our dependency statute assumes that parental conduct or circumstances that render a child dependent may be remedied. In this case, DHR not only failed to prove that the parents were a continuing threat to the child, DHR actually agreed that they were not a threat. DHR basically admitted that the child was no longer in need of DHR's protection, care, or supervision.
The majority opinion also relies on the ore tenus rule, evidently concluding that, based on its firsthand observations of the witnesses, the juvenile court could have reasonably believed that the parents represented some continuing threat to the welfare of the child. However, the evidence in this case is basically undisputed. The parents did not contest the facts and circumstances surrounding the child's injuries. DHR did not contest the facts and circumstances surrounding the parents' rehabilitation and condition at the time of the July 10, 2007, hearing. In order to conclude that the parents could not safely resume custody of the child, the juvenile court would have had to ignore the testimony of every single witness, most of whom were uninterested persons and at least one of whom was identified as a DHR representative. The ore tenus rule gives great deference to juvenile courts in sifting through and assessing conflicting evidence to reach a factual conclusion, see Friedman v. Friedman, 971 So.2d 23, 28 (Ala. 2007), but it does not grant a juvenile court the discretion to wholly ignore undisputed testimony. See Ex parte Ward, 782 So.2d 1285 (Ala.2000). Additionally,
"`even under the ore tenus rule, "[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed."' B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979))."
Cheek v. Dyess, [Ms. 2060124, Sep. 7, 2007] ___ So.2d ___, ___ (Ala.Civ.App.2007). The juvenile court must rest its decision on the evidence presented at the hearing and cannot withhold custody of the child based on a suspicion raised by the absence of evidence.
Furthermore, if the juvenile court was clearly convinced that the parents had abused the child, it should not have ordered DHR to use reasonable efforts to reunite the family and should have forthwith proceeded to permanent placement of the child with consideration of termination of parental rights. Under Ala.Code 1975, §§ 12-15-65(m)(1) & (4), DHR is excused from its general duty to use reasonable efforts if a parent has subjected a child to an aggravated circumstance such as torture, chronic abuse, or a felony assault resulting in serious bodily injury to the child. In such cases, the juvenile court must hold a permanency hearing within 30 days of its determination that the parent has subjected the child to an aggravated circumstance, and the juvenile court and DHR must make reasonable efforts to effect and finalize the permanent placement of the child. Ala.Code 1975, § 12-15-65(n). In addition, if a parent has committed a felony assault against a child resulting in serious bodily injury to the child, the law generally requires DHR to immediately file a petition to terminate parental *56 rights, see Ala.Code 1975, § 26-18-5(b). By ordering DHR to use reasonable efforts to reunite the family throughout this case until August 8, 2007, the juvenile court indicated that it was not clearly convinced that the parents had feloniously assaulted the child and that it believed the family could be reunified if rehabilitation was successful. However, when rehabilitation had succeeded, the juvenile court apparently relied on the earlier finding of dependency to continue to separate the family.
Finally, I believe the uncontradicted evidence indicates that it is in the best interests of the child to allow the parents to resume custody. It is undisputed that the parents could meet the child's financial needs because the evidence showed that the father had steadily worked for over 29 years and that the couple maintained a nice and neat home with a well-equipped nursery stocked with clothes and toys for the child. As for the child's emotional needs, it is apparent from the record that the child loves and has bonded with the parents, with her first words being "Daddy" and her actions indicating a strong attachment to the mother. The parents never missed a single visit with the child. The mother testified that she could devote 100% of her time to raising the child. According to Hollis and Braswell, the mother was so attuned to the child that the mother could tell from the child's cries what the child needed and the mother would always respond appropriately. The mother testified further that she had attended every doctor's appointment and indicated knowledge of and the ability to meet the child's medical needs. Nothing in the record indicates that the parents cannot meet the child's other needs as the child develops.
I conclude that, even if the child remained dependent based on the lack of explanation for her head injuries, the parents still proved by undisputed evidence that it was in the child's best interests to return home. Section 12-15-71(a)(1) specifically states that "[i]f a child is found to be dependent, the court may ... [p]ermit the child to remain with the parents ... subject to conditions and limitations as the court may prescribe." As this statute plainly indicates, if the child remained dependent, the juvenile court did not necessarily have to maintain placement outside the parental home but could have ameliorated the perceived threat to the child by requiring that the parents submit periodic medical reports to DHR or the court until such time as the court is convinced that the parents are adequately caring for the child, ordering DHR to randomly inspect the child and the home to assure that the child is safe, and/or requiring DHR to continue monitoring the mother's addiction recovery progress. See generally L.B.S. v. L.M.S., 826 So.2d 178, 184 (Ala.Civ.App. 2002) (plurality opinion) (recognizing that state must use the most narrowly tailored means of serving compelling state interest of protecting the best interests and welfare of children).
Although I recognize the difficult situation presented to a juvenile court when a child sustains a serious unexplained injury, I cannot conclude that in this case the mere fact of the injury alone legally justifies prolonged separation of the family. When the other evidence indisputably indicates that, because of successful rehabilitation or otherwise, the parents can properly care for and supervise the child, and that a return to parental custody, whether limited or unrestricted, serves the best interests of the child, the juvenile court should not be allowed to withhold custody of the child, especially on the impossible condition that the parents explain the unexplainable. Because I believe the evidence does not support any judgment other than *57 a return of custody of the child, I respectfully dissent.
NOTES
[1] Methadone is "a synthetic addictive narcotic drug" used "for the relief of pain and as a substitute narcotic in the treatment of heroin addiction." Merriam-Webster's Collegiate Dictionary 781 (11th ed.2003).
[2] The record indicates an alternative spelling of this name as Dr. Michelle Amaya.
[3] Because the parents have not raised the issue, I do not address whether DHR had a legal basis for adopting this policy.